962 A.2d 1170

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**James W. VANDIVNER, Appellant.**

Supreme Court of Pennsylvania.

Submitted Sept. 13, 2007.

Decided Jan. 23, 2009.

618

Dianne H. Zerega, Esq., Zerega Law Offices, Susan Elizabeth Ritz, Esq., Fayette County Public Defender's Office, Uniontown, for James W. Vandivner.

Amy Zapp, Esq., Office of the Attorney General, Harrisburg, Nancy Ann Duffield, Esq., Fayette County District Attorney's Office, Uniontown, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

This is appellant's direct appeal from the February 12, 2007 sentence of death imposed following his trial by jury before the Honorable Gerald R. Solomon of the Court of Common Pleas of Fayette County. The issues raised by appellant lack

merit; therefore, we affirm the conviction and judgment of sentence.[1]

Jessica Cable and her mother Michelle Cable lived at 100 East Second Street, Grindstone, Fayette County. On July 5, 2004, Jessica was babysitting at a neighbor's home. Between 8:30 and 9:00 p.m., Jessica saw appellant driving in the direction of her home and immediately ran home. When she arrived, she saw appellant get out of his vehicle and walk to the back porch of her home. As Jessica followed, appellant entered the home through the back door and, while walking through the home, encountered a family friend, Larry Newman, in the living room. Appellant asked Larry where Michelle was, and Larry pointed to the front door. Appellant then opened the door and walked onto the sun porch.

On the steps leading to the sun porch from the outside, appellant met Michelle and her son, Billy Cable. As appellant walked onto the porch, Billy told him, "Dude, get off my property." Notes of Testimony ("N.T."), 2/7/07, at 36. Appellant then pointed a gun at Michelle, at which point, Billy pounced on appellant in an attempt to wrestle the gun from his hand. Appellant managed to keep the gun and pointed it at Larry Newman's head. Larry's relative, Kenneth Newman, then rushed appellant, and the gun fired. Appellant, who still had the gun, walked quickly to Michelle and told her he was going to kill her. He grabbed her by the hair, shot her in the head, and, as she fell to the ground, stated, "There, you bitch, I said I was going to kill you." *Id.* at 39. Appellant smiled and walked away. A motorist who was passing by saw appellant grab Michelle by the hair and shoot her in the head.

Meanwhile, after unsuccessfully attempting to take the gun from appellant, Billy had gone inside the home to look for a weapon to protect his family. When he was unable to find a weapon, he left the home. As he stepped off the back porch,

1. Disposition of this appeal was delayed by the Commonwealth's initial decision not to file a brief, notwithstanding that this is a capital direct appeal in a matter that the District Attorney thought warranted the death penalty. Such a practice is unacceptable. By order dated October 19, 2007, this Court directed the Commonwealth to file a responsive brief, and the Commonwealth has complied.

Billy saw appellant walking toward him with the gun in his hand. Appellant pointed the gun at Billy, who turned to run away. Appellant shot Billy in the neck and then left the scene. Police subsequently apprehended appellant in a field and recovered a Jennings J22 handgun. As appellant was being taken into an interview room at the Pennsylvania State Police barracks, he blurted out to Trooper James Monkelis, "This is a death penalty case and I don't want the needle, life for a life. Tell the DA I will plead guilty to life. I would have killed myself if I knew Michelle was dead." N.T., 2/8/07, at 255.

On July 8, 2004, Dr. Cyril Wecht performed an autopsy on Michelle and determined that the manner of death was homicide in that she "died as a result of anoxic and cephalopathy, diminution of oxygen to the brain tissue with degeneration, early necrosis, death of brain tissue, produced as a result of the gunshot wound to the head." *Id.* at 244. Dr. Wecht recovered the bullet from Michelle's brain and provided it to the State Police for analysis. Corporal David J. Burlingame, an expert in the field of firearm and toolmark examination determined that the bullet recovered from Michelle's brain was fired from the Jennings 22 handgun found in appellant's possession at the time of his apprehension.

Prior to trial, appellant filed a petition to bar the death penalty, alleging that he is mentally retarded and has significant limitations in adaptive skills. He argued that, pursuant to *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the execution of a mentally retarded person constitutes cruel and unusual punishment and requested a pretrial hearing to determine whether the death penalty should be barred in this instance. Judge Solomon held a four-day hearing on appellant's petition at which appellant presented the testimony of two expert witnesses and several lay witnesses, and the Commonwealth offered the testimony of a psychiatrist and an official of the Department of Transportation. Judge Solomon determined that appellant had failed to meet his burden of proving that his limitations, if any, began before he was 18 years of age, as required by the standards

for determining mental retardation endorsed by this Court in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005). Thus, based upon appellant's failure to establish this element, the court denied the petition.

A jury found appellant guilty of the first-degree murder of Michelle, criminal attempt to commit criminal homicide with respect to Billy and the aggravated assault of Larry Newman. At the penalty phase hearing, the Commonwealth presented evidence of two aggravating circumstances: (1) that, in the commission of the offenses appellant knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); and (2) that appellant had a significant history of felony convictions involving the use or threat of violence, *id.* § 9711(d)(9). The jury found both aggravating circumstances and one mitigating circumstance related to appellant's character and the circumstances of his offense, *id.* § 9711(e)(8) (the "catchall" mitigator), and determined that the two aggravating circumstances outweighed the mitigating circumstance. Thus, the jury returned a sentence of death. On February 12, 2007, the trial court formally imposed the death sentence as well as a consecutive sentence of 20 to 40 years for the attempted homicide of Billy Cable and a sentence of 10 to 20 years to run consecutively to appellant's sentences for first-degree murder and attempted murder, for the aggravated assault of Larry Newman.

Appellant raises eight issues in this direct appeal, five related to the guilt phase and three involving his petition to bar the death penalty and the penalty phase.

## I. Sufficiency and Weight of the Evidence

## II. Jury Error in Finding Appellant Guilty of Murder

Appellant argues his first two issues together, related to the sufficiency and weight of the evidence and jury error in finding him guilty of first-degree murder. Because the two issues are set forth as sufficiency and weight claims, they will be addressed together as such.[2]

2. As a matter of practice, this Court always reviews the sufficiency of the evidence for first-degree murder convictions in capital direct ap-

■ Appellant claims that the evidence presented at trial was insufficient to enable the trier of fact to find every element of the crimes charged beyond a reasonable doubt. He contends that it is clear that the jury was confused and could not have found him guilty of first-degree murder based upon what he terms the speculative and unreliable evidence presented, which he claims was inconsistent and contradicted by the physical and testimonial evidence. He further argues that the evidence supports the proposition that he was intoxicated at the time of the crime. Appellant bases this argument on the testimony of his uncle, Donald VanDivner, who testified that he and appellant drank beer at a bar from approximately 11 a.m. until 4 p.m. on the day of the murder, and that of his brother, Albert VanDivner, who also testified to the imbibing, adding that the men began the day with an eight ball[3] of crack cocaine and that they occasionally left the bar to smoke the crack cocaine. Due to his alleged intoxication, appellant argues, the evidence was insufficient to convict him of first-degree murder because the use of intoxicants negates the specific intent required for a conviction.

In addition, appellant argues that he was incapable of forming the required specific intent due to his diminished capacity. He points to the testimony of a defense witness, psychologist Adam Sedlock, who stated that appellant's overall level of function is in the mild range of mental retardation and that he has organic functional problems with the frontal lobe of his brain, which controls his ability to think before he speaks or acts. Appellant argues that the Commonwealth did not refute his diminished capacity claim; therefore, he posits, the jury could not have found that he was capable of forming the requisite specific intent.

The Commonwealth responds that the evidence demonstrated that there were several eyewitnesses to the murder. Appellant shot one witness, Billy Cable in the neck, Jessica Cable

peals, irrespective of whether the appellant mounts a sufficiency challenge. *E.g.*, *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 651 n. 3 (2008).

**3.** An eight ball is one-eighth of an ounce of drugs.

watched as appellant shot her mother, appellant pointed his gun at the head of a third witness, Larry Newman, and a driver passing by on the street witnessed appellant shooting Michelle Cable in the head. The Commonwealth argues that the jury heard testimony that appellant had consumed alcohol and crack cocaine prior to the shooting but chose not to reduce the verdict, noting that the jury may disregard all, part or some of the evidence. Further, the Commonwealth claims that it established that appellant possessed specific intent to kill in that, while armed with a handgun, he grabbed Michelle by the hair and shot her in the head, thereby using a deadly weapon upon a vital part of the victim's body.

In its Opinion in Support of Jury Verdict and Sentence, the trial court found the evidence sufficient to support the first-degree murder conviction in that all of the elements of first-degree murder were met. According to the trial court, the evidence established that: (1) two eyewitnesses, Jessica Cable and the driver passing by, testified that appellant approached Michelle, grabbed her by the hair and then shot her in the head with a handgun; (2) Dr. Wecht testified that Michelle died as a result of a gunshot wound to the head and that the manner of death was homicide; (3) the bullet recovered from Michelle's head was fired from the Jennings J22 handgun found in appellant's possession at the time he was apprehended; (4) just prior to shooting Michelle, appellant stated that he would kill her and then, after shooting her, he said, "there you bitch, I said I was going to kill you;" and (5) Dr. Wecht testified that the only gunshot wound Michelle suffered was to her head and that the head is a vital part of the body. The court found that the jury could infer specific intent from the use of a deadly weapon on a vital part of Michelle's body.

■■ When reviewing a claim that the evidence was insufficient, we view the evidence in the light most favorable to the Commonwealth as the verdict winner to determine if the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Edwards*, 588 Pa. 151, 903 A.2d 1139, 1146 (2006), *cert. denied*, 549 U.S. 1344, 127

S.Ct. 2030, 167 L.Ed.2d 772 (2007) (citing *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 864 (2000), *cert. denied,* 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002)). To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Edwards,* 903 A.2d at 1146. Specific intent may be inferred from the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 135 (2001), *cert. denied,* 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355 (2002).

The trial evidence overwhelmingly established that appellant killed Michelle Cable and it was amply sufficient to prove that he acted with a specific intent to kill. Four separate eyewitnesses to the murder testified that appellant shot Michelle in the head with a handgun. Upon apprehension, appellant himself freely admitted to police that he had killed Michelle. Dr. Wecht testified that Michelle's manner of death was homicide, caused by the gunshot wound to her head. Specific intent is also supported by the very fact that appellant went to Michelle's home with a loaded handgun, his contemporaneous statement that he had told Michelle he would kill her, and the fact that he promptly followed through on this threat. Finally, the jury properly could infer specific intent from appellant's use of a handgun upon Michelle's head.

Appellant nevertheless claims that his voluntary intoxication and/or diminished capacity negated specific intent. Whether a defendant has established that his "faculties and sensibilities were so overwhelmed with drugs so that he could not form the specific intent to kill is a question of fact solely within the province of the jury, who is free to believe any, all, or none of the testimony regarding intoxication." *Commonwealth v. Fletcher,* 580 Pa. 403, 861 A.2d 898, 908 (2004), *cert. denied,* 547 U.S. 1041, 126 S.Ct. 1617, 164 L.Ed.2d 336 (2006) (citing *Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714, 720 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984)). Similarly, the defense of diminished capacity is a

matter for a jury to believe or disbelieve as it sees fit. *Commonwealth v. Terry*, 513 Pa. 381, 521 A.2d 398, 412 (1987), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987) (overruled on other grounds by *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989)). Thus, appellant's jury was not obligated to believe his claims of intoxication or diminished capacity, and apparently it did not do so.

The evidence presented as to the events leading to and the manner in which the murder of Michelle Cable occurred is not diminished by appellant's claims of voluntary intoxication or diminished capacity, at least for the purpose of sufficiency review. Indeed, appellant's own statement to police shortly after the murder that he killed Michelle and recognized that this case was a death penalty case corroborates his full awareness of what he had done. Accordingly, the evidence clearly was sufficient to support appellant's conviction for first-degree murder.

As to the weight of the evidence, appellant argues that the testimony the Commonwealth presented was inconsistent and contradicted by the physical evidence. He further alleges that the Commonwealth's evidence was of such a speculative and unreliable nature that there could be no reasonable inferences drawn from the evidence. In his intertwined arguments on weight and sufficiency, appellant points to the testimony of defense witnesses that he was intoxicated on the day of the murder and argues that the use of intoxicants negates the specific intent required for a first-degree murder conviction. Further, he contends that the evidence established his diminished capacity through the testimony of Adam Sedlock.

The Commonwealth counters that it is the province of the jury to determine the credibility of witnesses and the weight to be accorded to the evidence produced, and the jury is free to believe all, part of none of the evidence. *See Commonwealth v. Tate*, 485 Pa. 180, 401 A.2d 353 (1979). The Commonwealth asserts that the fact that appellant introduced evidence of his intoxication and diminished capacity does not require the jury to credit the testimony. It is apparent from the verdict, the Commonwealth argues, that the jury did not

believe appellant's defense testimony. Further, the Commonwealth states that appellant failed to elaborate on his claim that the Commonwealth's evidence was speculative and unreliable.

The trial court noted that the determination of whether a verdict is against the weight of the evidence lies within the discretion of the trial court and that a mere conflict in the testimony does not require a new trial. The court outlined the evidence establishing that several witnesses observed appellant shooting Michelle in the head and found that the conviction for first-degree murder was not against the weight of the evidence.

A verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1036 (2007). As the trial court noted, a weight of the evidence claim is addressed to the discretion of the trial judge. It is the province of the jury to assess the credibility of witnesses, and a trial judge will not grant a new trial merely because of a conflict in the testimony or because he would have reached a different conclusion on the same facts, if he had been the trier of fact. *Commonwealth v. Blakeney*, 946 A.2d at 652–53 (citing *Edwards*, 903 A.2d at 1148, and *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 703 (2002)). This Court's function on review is to determine whether, based upon a review of the record, the trial court abused its discretion rather than to consider the underlying question of weight of the evidence. *Id.*

Here, appellant has failed to fully develop this claim in terms of the governing law. He points to no specific conflicting testimony nor to any testimony that was speculative or unreliable. Rather, he merely sets forth the defense testimony of intoxication and diminished capacity. Our review of the record reveals that the trial court did not abuse its discretion in rejecting this claim. The testimony overwhelmingly established that appellant committed the killing, leaving it for the jury to determine the disputed question of whether he pos-

sessed the requisite specific intent for first-degree murder. As the Commonwealth argues, the jury was free to believe all, part or none of the defense testimony. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004). Apparently, the jury disbelieved the testimony from appellant's relatives regarding his alleged intoxication and the testimony of his psychologist that he suffers from diminished capacity, which is entirely within the jury's authority as the trier of fact. Or, even if the jury credited the defense testimony in whole or in part, it could still conclude that the objective circumstances, including appellant's statements and admissions, proved specific intent to kill. The trial court was in the best position to assess whether this was one of those rare circumstances where a verdict based on sufficient evidence was nevertheless contrary to the weight of the evidence. We find no abuse of discretion by the trial court, and thus, this claim merits no relief.

### III. Defense Objection to the Testimony of Dr. Cyril Wecht

Appellant claims that the trial court erred in overruling his objection to the testimony of Dr. Wecht on the grounds that the Commonwealth had not laid a proper foundation for its questions regarding the basis for Dr. Wecht's opinion that the manner of death was homicide, and that the testimony was hearsay. Specifically, he argues in a single sentence that Dr. Wecht "testified to information received from some source in the Fayette County Coroner's Office." Appellant's Brief at 19. Appellant contends that expert opinions may be based upon the reports of others only if the proper foundation is laid regarding where and from whom the information is gathered and that this information is customarily relied upon in the practice of the expert's profession, citing *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971).

The Commonwealth replies in a single paragraph that a proper foundation was laid for Dr. Wecht's testimony. According to the Commonwealth, Dr. Wecht testified that the

attending coroner discussed his findings with Dr. Wecht as per the usual framework of medically-related cases and that the information he received from the attending coroner is the type of information that a pathologist relies upon in the practice of his profession to aid in rendering an opinion on the cause and manner of death.

The trial court noted that Dr. Wecht testified that his opinion was based upon information he received from Dr. Phillip Reilly, the Coroner of Fayette County, which he then incorporated into his overall analysis of the case. The court noted that an expert witness is permitted to express an opinion on medical matters based, in part, upon reports of others where the expert customarily relies upon such reports in the practice of his profession. Dr. Wecht testified that the information supplied by Dr. Reilly in this case is the type of information he regularly relies upon in his profession. Therefore, the trial court concluded, the contested testimony was properly admitted.

■ Questions regarding the admissibility of evidence rest within the trial judge's discretion, and an appellate court will reverse the judge's decision only for an abuse of discretion. *Commonwealth v. Brown*, 592 Pa. 376, 925 A.2d 147, 154 (2007) (citing *Commonwealth v. Spotz*, 562 Pa. 498, 756 A.2d 1139, 1151, 1163 (2000), *cert. denied*, 532 U.S. 932, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001)). We have reviewed the testimony of Dr. Wecht in its entirety and, based upon the testimony, we find no abuse of discretion in the trial court's ruling. Dr. Wecht testified that on the morning of July 8, 2004, he himself performed an autopsy on Michelle Cable at the request of Dr. Reilly. N.T., 2/8/07, at 237. He found that some of her organs and tissues had been removed post-mortem for organ donor purposes but that none of the tissues or organs were of any consequence to his review. He testified that he found a gunshot wound on the left side of Michelle's head at the bottom of the left ear and slightly behind the left ear lobe. *Id.* at 237–38. The wound had been sutured by doctors at the hospital where she had been a patient for the two days following the gunshot wound. *Id.* at 238. Dr. Wecht de-

scribed how he removed the sutures and examined the wound, explaining his detailed findings regarding the wound and its effect on her brain. *Id.* at 238–40. He noted that the edges of the wound were blackened from the gun powder, which is an indication that the shot was fired at close range, and that there was no stippling, meaning that the gun's muzzle was no farther than an inch or so from Michelle's head when the shot was fired. *Id.* at 240. Dr. Wecht testified that the head is a vital part of the body because the brain is the most important organ because "it runs the show," and that the cause of death in this instance was "anoxic and cephalopathy due to the gunshot wound of the head with damage to the skull and brain." *Id.* at 241.

Regarding the manner of Michelle's death, Dr. Wecht testified that when he sees a near contact wound of the head, there are three possibilities: homicide, accident and suicide. *Id.* at 245. A pathologist looking at such a wound cannot determine, without more information, which of the three possibilities occurred. This additional information is generally gleaned from the police investigation—whose gun was used, was the gun found near the decedent's body, is there any reason to believe the decedent was cleaning the gun or fooling around, making it an accident? If there are no indications of accident or suicide, then the conclusion is that it is a homicide. Dr. Wecht testified that in this instance, he received information from the State Police and from Dr. Reilly's office, at which point defense counsel objected that his testimony was based on hearsay, and the trial judge questioned Dr. Wecht. The court asked Dr. Wecht if he received a report from Dr. Reilly or discussed the matter with him. Dr. Wecht responded that he discussed the case with Dr. Reilly, which is what is always done, and that the discussion is analogous to the hospital records he would get when someone dies in a hospital and provides information that he utilizes in his overall analysis of a case. The trial judge overruled the objection to the extent that the information Dr. Wecht relied upon came from Dr. Reilly but stated he would sustain the objection as to information gleaned from any other source. Dr. Wecht then rendered

his opinion that the manner of death was homicide. *Id.* at 246–47.

In *Commonwealth v. Smith,* 480 Pa. 524, 391 A.2d 1009 (1978), this Court was presented with a similar scenario. There, the expert pathologist testified as to the cause and manner of death based in part upon information provided to him by the deputy county coroner.[4] The *Smith* Court allowed the testimony, noting that, in *Commonwealth v. Thomas,* 444 Pa. 436, 282 A.2d 693 (1971), this Court adopted the rule that a medical witness may express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession. The trial court here cited to *Smith* in its opinion as support for allowing the testimony. Dr. Wecht clearly testified that he customarily uses information received from the coroner or hospital records in rendering his opinions regarding cause and/or manner of death. He also stated that, in a case involving a close-range gunshot wound, this information typically includes whose gun was used, whether the gun was found near the body, and whether there was any indication of an accident. Based upon this testimony, the trial court did not abuse its discretion in allowing Dr. Wecht to testify as to the manner of death based, in part, upon the information he received from Dr. Reilly.

█ Furthermore, even assuming that the trial court erred, any error was harmless in light of the substantial evidence buttressing Dr. Wecht's conclusions regarding the manner of death. Indeed, the manner of Michelle's death was undisputed at trial. Four eyewitnesses testified to having seen appellant shoot Michelle in the head. Appellant admitted to police that he had killed Michelle. The bullet recovered from Michelle's head by Dr. Wecht was fired from the gun found in appellant's possession when he was apprehended. All

4. In *Smith,* the deputy coroner was not a medical doctor, and the defendant's objection was based in part upon the qualifications of the coroner to provide medical information. The Court's holding as to the issue of a proper foundation, however, is instructive in this case.

of this evidence amply demonstrated that the manner of Michelle's death was neither accident nor suicide.

## IV. Motion in Limine Regarding Testimony of Trooper Monkelis

Appellant claims that the trial court erred in not granting his motion in limine to exclude his statement to State Police Troopers that: "This is a death penalty case and I don't want the needle, life for life. Tell the [District Attorney] I will plead guilty to life. I would have killed myself if I knew Michelle was dead." Appellant argues that this statement did not constitute a confession, was not relevant, and had no probative value. He contends that the true intent of the statement was to initiate plea negotiations.

The Commonwealth accurately responds that appellant has failed to explain how this statement was irrelevant or why it is not a confession. The Commonwealth notes that appellant was captured in a field after a manhunt. He had been hiding in the woods for a period of time and emerged disheveled and carrying a loaded handgun. Appellant had a violent past and had been imprisoned during his adult life in both Pennsylvania and Ohio. According to the Commonwealth, appellant's statement at the State Police barracks was spontaneous, voluntary and relevant, and therefore admissible at trial.

The trial court found appellant's statement to be an admission that was properly admitted into evidence at trial. The court noted that statements tending to show guilt are by their very nature prejudicial, but they are also extremely probative of and relevant to a defendant's participation in the crime charged. Thus, the court found the statement to be explanatory of the issues at trial and tending to prove appellant's guilt.

Again, the admissibility of evidence is a matter within the trial judge's discretion and evidentiary decisions will not be reversed absent an abuse of discretion. *Brown*, 925 A.2d at 154. We have consistently held that spontaneous, volunteered statements like appellant's statement to police in

this instance are admissible against constitutional exclusionary rule challenges. *Commonwealth v. Fisher,* 564 Pa. 505, 769 A.2d 1116, 1125 (2001). Here, appellant does not argue that his statement was inadmissible on constitutional grounds. Moreover, the content of the statement obviously was relevant: it was an admission of guilt. In addition, the statement had substantial probative value in that appellant in effect admitted that he knew precisely what he had done including the potential consequences of his conduct. That awareness, in turn, was relevant to rebut his trial claims of voluntary intoxication and diminished capacity.

Appellant nevertheless contends that his statement was made in an attempt to initiate plea negotiations, and that statements made in furtherance of plea bargaining are not admissible.[5] The trial court stated in a footnote that, while statements made in connection with an offer to plead guilty are inadmissible, voluntary, unsolicited statements by a defendant to authorities are not considered to be made in furtherance of striking a plea bargain, citing *Commonwealth v. Calloway,* 313 Pa.Super. 173, 459 A.2d 795, 801 (1983).

Rule 410 of the Pennsylvania Rules of Evidence provides that statements made during plea negotiations are not admissible in evidence against the defendant participating in the plea negotiations. Here, however, there is no suggestion that plea negotiations were ongoing at the time appellant made his statement to police. Rather, he had been apprehended a short time before spontaneously making the challenged statement to police. Appellant takes an absolute position on this, resting upon his suggestion that the statement was a negotiation. But the very word "negotiation" posits the participation of two parties and not unilateral conduct. Here, there was no such negotiation, and thus, Rule 410 exclusion is not implicated.

In the absence of appellant's proffering some measure by which Rule 410 would be implicated as a practical matter, we will, for purposes of this decision, look to the Fifth Circuit's

---

**5.** The Commonwealth does not address this component of appellant's argument.

standard for determining whether plea negotiations are under-
way, a standard our Superior Court approved in *Calloway:*

Initially, however, it must be determined in such cases
whether or not the statement or statements made by an
accused are in connection with plea negotiations. *U.S. v.
Robertson*, 582 F.2d 1356 (5th Cir.1978) provides a workable
analytical framework to determine the appropriate charac-
terization:

". . . first, whether the accused exhibited an actual subjec-
tive expectation to negotiate a plea at the time of the
discussion, and second, whether the accused's expectation
was reasonable given the totality of the objective circum-
stances." *Id.* at 1366.

Of primary importance in assessing an accused's subjec-
tive expectation of negotiating a plea is whether the Com-
monwealth showed an interest in participating in such dis-
cussions. In line with this reasoning, voluntary, unsolicited
statements uttered by an accused to authorities cannot be
said to be made in furtherance of striking a plea bargain.

*Calloway*, 459 A.2d at 800–01.

This standard is consonant with our above recognition that
negotiation presupposes the participation of two parties.
Here, there is no allegation by appellant, nor is there any
evidence in the record suggesting that, at the time of appel-
lant's statement, when he had just been apprehended for a
murder witnessed by several people, the Commonwealth had
conveyed any interest in negotiating a plea. Appellant's state-
ment was a voluntary, unsolicited confession to the State
Police troopers, not a statement made in furtherance of non-
existing plea negotiations. Thus, the trial court did not abuse
its discretion in denying appellant's motion in limine.

### V. Limiting Testimony of Defense Witness Adam Sedlock

Appellant next argues that the trial court erred in
limiting the testimony of his psychological expert, Adam Sed-
lock, by not permitting Sedlock to testify regarding appellant's
adaptive skills. Appellant claims that such testimony was

relevant to the question of his ability to plan, deliberate and premeditate, although he neither explains what adaptive skills he lacks nor how they impact his ability to plan, deliberate and premeditate. The Commonwealth responds that, in order to establish diminished capacity, a defendant must show, through psychiatric testimony, that he suffers from a mental disorder affecting the cognitive functions of deliberation and premeditation. According to the Commonwealth, evidence that the defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and thus inadmissible on the issue of specific intent to kill, citing *Commonwealth v. Sasse,* 921 A.2d 1229 (Pa.Super.), *alloc. denied,* 595 Pa. 706, 938 A.2d 1052 (2007). The Commonwealth claims that Sedlock properly testified at trial to his opinion of appellant's mental disorder, IQ and psychological diagnosis, but that adaptive behavior (how appellant had adapted to his environment) is not related to cognitive functions as they impact on premeditation or specific intent.

Relying on *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344 (1982), the trial court recognized in its opinion that diminished capacity is an extremely limited defense that can only be established by psychiatric testimony regarding mental disorders affecting the cognitive functions of the brain necessary to formulate specific intent. According to *Weinstein,* testimony that does not go to specific intent and premeditation is irrelevant.

In light of *Weinstein,* and bedrock restrictions on relevancy, there was no abuse of discretion in the trial court's ruling. At a sidebar conference, the Commonwealth objected to the introduction of evidence regarding adaptive behaviors, emphasizing that that sort of evidence was irrelevant to a determination of whether appellant had a mental disorder that interfered with his ability to form specific intent. In response, appellant's counsel did not argue that adaptive behaviors are mental disorders, but rather merely offered that she thought the behaviors were part of appellant's mental stability. The trial court pointedly responded that the relevancy of Sedlock's testimony related to appellant's diminished capacity defense,

and Sedlock had testified fully with regard to the tests he performed and the results of those tests. The court stated that, although testimony about appellant's adaptive capacity might become relevant at another point in the trial—plainly alluding to the penalty phase—such testimony was not relevant for the proffered point in the guilt phase. Thus, the court sustained the Commonwealth's objection to the testimony.

In *Commonwealth v. Legg,* 551 Pa. 437, 711 A.2d 430, 433 (1998), this Court outlined the parameters of a diminished capacity defense:

> Diminished capacity, however, is an extremely limited defense. [*Commonwealth v.] Travaglia* [, 541 Pa. 108, 661 A.2d 352 (1995), *cert. denied,* 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996) ]. Psychiatric testimony that addresses "mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent" is admissible. [*Commonwealth v.] Zettlemoyer,* 500 Pa. 16, [454 A.2d 937, 943 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) ]. However, psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill. *Id.*

In addition to the fact that Sedlock was not a psychiatrist, Sedlock's opinion that petitioner was unable to control his actions and tended to act impulsively was precisely the type of evidence this Court held to be inadmissible, in a similar situation, in *Legg.* In light of *Legg,* the trial court plainly did not abuse its discretion in sustaining the Commonwealth's objection to this testimony.

## VI. Trial Court's Determination that Appellant is not Mentally Retarded

█ Appellant notes that the United States Supreme Court in *Atkins v. Virginia, supra,* overturned prior law and held that the execution of mentally retarded persons now violates the Eighth Amendment's prohibition against cruel and

unusual punishment. Appellant accurately sets forth this
Court's holding in *Commonwealth v. Miller*, 585 Pa. 144, 888
A.2d 624 (2005), as establishing the current definition of
mental retardation for purposes of *Atkins*. He notes that, in
*Miller*, this Court determined that mental retardation is es-
tablished where a defendant demonstrates that: (1) he pos-
sesses limited intellectual functioning, meaning that his IQ
score is approximately two standard deviations (or 30 points)
below the mean (100) with a standard error of measurement of
three to five points as set forth in the American Association of
Mental Retardation's ("AAMR") Mental Retardation: Defini-
tion, Classification, and Systems of Supports 1 (10th ed. 2002)
("Mental Retardation"); (2) his adaptive behavior (conceptual,
social, and practical skills) is significantly limited; and (3) the
age of onset was before age eighteen. *Id.* at 631.

Appellant claims that he met all three elements of *Miller*.
Specifically, defense psychologist Adam Sedlock administered
the Wechsler Adult Intelligence Scale—3rd Edition to appel-
lant, who scored a verbal scale intelligence quotient ("IQ") of
66–76, a performance scale IQ of 60–70 and a full scale IQ of
61–71, which appellant claims indicates he is functioning within
the mild range of mental retardation. Appellant adds that he
was in special education classes until he dropped out of school
during the 1964–65 school year when he was in tenth grade.
According to appellant, Sedlock performed a psychological
evaluation and determined that appellant had an organic brain
syndrome and closed head trauma, although neither had al-
tered his IQ. Appellant also claims that the testimony of Dr.
Lawson Frederick Bernstein, Jr., a clinical and forensic neuro-
psychiatrist who testified on behalf of appellant, established,
based on an MRI, an EEG, and a psychiatric evaluation, that
appellant was mildly mentally retarded, had dementia due to
head trauma/cardiovascular disease, suffered from cerebrovas-
cular disease and at some point had had a stroke.

Appellant states that Sedlock also interviewed appellant's
sister, Mildred Patton, and administered the Vineland
Adaptive Behavior Scales to determine if appellant's adaptive
skills were limited and if the onset of his mental retardation

occurred prior to age eighteen. Sedlock testified that appellant's composite score on the Vineland test was 65, indicating that he was functioning within the mild range of mental retardation. Based upon his interview, Sedlock concluded that appellant's social skills are deficient and he cannot manage either his money, his own health concerns or his interpersonal relationships. Sedlock also administered the Wide Range Achievement Test, which revealed that appellant's sight reading and mathematics skills are at the second grade level, and he spells at a first grade level. Sedlock testified that appellant had impulse control problems that have their origins in his cognitive limitations and/or organic changes in appellant's frontal lobe. He also diagnosed appellant with antisocial personality disorder. Sedlock further opined that the onset of appellant's supposed mental retardation occurred prior to age eighteen, based upon his school records showing he was in special education classes, the testimony of appellant's sister, and Dr. Bernstein's testimony that IQ does not change over a lifetime. Based upon all of this evidence, appellant claims that he established by a preponderance of the evidence that he is mentally retarded and, therefore, the trial court should have barred the Commonwealth from proceeding with the death penalty in this case.

The Commonwealth counters that the trial court held four days of hearings on the issue of appellant's mental functioning at which Sedlock, Dr. Bernstein, and the Commonwealth's psychiatric expert, Dr. Bruce Wright, testified. According to the Commonwealth, all of the expert witnesses agreed that there was no testing performed on appellant prior to age eighteen. Further, the Commonwealth contends that there is no objective evidence of any significant limitation in adaptive behavior caused by mental retardation. The Commonwealth points to the fact that appellant, when not incarcerated, maintained full-time employment as a licensed CDL (commercial driver's license) truck driver, and that any social problems he may have can be attributed to his anti-social personality or his polysubstance abuse.[6] The Commonwealth notes that while

6.  The Commonwealth asserts that the CDL license test is a difficult test consisting of 70 questions, 80% of which must be answered correctly,

appellant's school records indicate that he was in special education classes, a school official testified that there were non-intelligence-related reasons a student might receive special education, such as disciplinary problems, and that appellant was absent 92 days of his tenth grade school year. Further, appellant's sister testified that she herself was in special education classes due to behavioral problems, not mental retardation.

The Commonwealth further notes that Dr. Wright testified that appellant was never dependent upon the government for any disability or financial aid, he worked for several companies and maintained a regular trucking route, he performed yard work and snow removal around his homes, had no problems with hygiene and was minimally cooperative but polite. Dr. Wright found appellant to be logical and goal oriented with no problem understanding any words Dr. Wright used. Dr. Wright performed a mini mental examination that revealed that appellant has mild to moderate cognitive impairment, can read and write, subtract by serial threes, spell backwards, and figure out change and the point values for touchdowns with and without the extra point.

According to the Commonwealth, Dr. Wright diagnosed appellant with possible dementia, history of polysubstance abuse, antisocial behavior, hypertension, head trauma and cerebrovascular disorder. He found that appellant has borderline cognitive impairment, which alone does not constitute mental retardation, but may be the result of a variety of factors, including poor compliance with school routine. In addition, according to Dr. Wright, appellant possesses several risk factors which can contribute to or cause cognitive impairment, such as hypertension, hypercholesterolemia, cerebrovascular insults like strokes, substance abuse and head trauma. Dr. Wright maintained that the only means of establishing onset of impaired mental function prior to age eighteen is

according to a Pennsylvania Department of Transportation witness, Ronald Beatty. Appellant took and passed the test in 1992, after which he drove an eighteen wheeler on a route between Pennsylvania and New Jersey.

through testing, and that a diagnosis of mental retardation cannot be made in light of appellant's deceitfulness, risk factors and the lack of objective testing prior to age eighteen.

The trial court, which heard the competing testimony, agreed with the Commonwealth that appellant failed to establish the onset of his alleged mental retardation before the age of eighteen.[7] Specifically, the court found that the best evidence would be IQ testing conducted before appellant was eighteen, but appellant failed to offer evidence of any such testing. Alternative evidence, the trial court noted, could include school records or other psychological records proving that appellant's alleged mental retardation manifested itself before age eighteen. The court noted that, while appellant was in special education classes in tenth grade, his school records did not identify him as mentally retarded, nor was there any indication that he was placed in special education classes due to mental retardation. The court pointed to the testimony of a school official to the effect that, at the time appellant was in school, there was no formalized procedure for placement in special education classes, as well as appellant's sister's admission that she was placed in special education classes because of behavioral problems, not mental retardation. The court concluded that appellant may have been placed in special education classes for a number of reasons, including poor attendance or behavior problems, and that there was no evidence that he was in special education classes because of a diagnosis or recognition of his mental retardation. In addition, the court noted that appellant's poor grades may reflect his poor attendance rather than any mental impairments. For all of these reasons, the court held that appellant had failed to prove that his mental retardation originated prior to age eighteen.

7. The trial court incorporated into its May 27, 2007 Opinion in Support of Jury Verdict and Sentence its Opinion and Order dated January 24, 2007, in which the court analyzed the testimony presented at the four-day hearing on appellant's petition to bar the death penalty and concluded that appellant had failed to establish that he was mentally retarded prior to the age of eighteen.

In *Miller,* this Court was called upon to implement an *Atkins* standard, given the inaction on the part of the General Assembly in the wake of *Atkins,* and held that a defendant may establish mental retardation through resort to either the AAMR's Mental Retardation standard or the American Psychiatric Association standard set forth in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) ("DSM–IV").[8] The two definitions, as the *Miller* Court noted, share three concepts: limited intellectual functioning; significant adaptive limitations; and age of onset. *Miller,* 888 A.2d at 630. Here, appellant elected to attempt to establish that he is mentally retarded by demonstrating the three shared concepts of the two definitions. He presented evidence that his IQ is at or below the standard set forth in Mental Retardation (two standard deviations, or 30 points, below the mean of 100 with a standard error of measurement of three to five points), that he had significant adaptive limitations in that he claims to be incapable of managing his personal finances and other aspects of his life, and that his mental retardation manifested itself in his childhood, arguing that his placement in special education classes and the testimony of his sister that he was incapable of certain academic and personal tasks established that he suffered from mental disabilities since his childhood.

We see no error in the trial court's finding that appellant failed to present sufficient evidence to establish that the onset of his alleged mental retardation occurred prior to age eighteen. The court properly noted that there were no IQ tests from appellant's childhood produced; and his school records do not establish that he was placed in special education classes as a result of mental retardation. Indeed, the evidence demonstrated that such a placement could result from behavioral

8. The AAMR's Mental Retardation defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." *Miller,* 888 A.2d at 629–30 (quoting Mental Retardation at 1). The DSM–IV definition is "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." *Id.* at 630 (quoting DSM–IV at 37).

problems rather than from mental retardation. The trial court also recognized that appellant's excessive absences from school could very well have been the cause of his poor academic performance. Thus, appellant simply failed to establish that the onset of his alleged mental retardation occurred prior to age eighteen. And, as the trial court noted, appellant's failure to establish this necessary element requires rejection of his claim of death penalty ineligibility due to mental retardation.

In a Concurring and Dissenting Opinion, Mr. Justice Baer opines that this Court's affirmance of the trial court's determination that appellant failed to establish the necessary requirement of onset of mental retardation prior to age eighteen is a "draconian" perversion of *Atkins* and *Miller* because we supposedly have erected an insurmountable barrier for defendants not fortunate enough to attend a school where objective IQ testing was performed.[9] Respectfully, we have not altered the governing standard, but merely have found that there was no error in the trial court's legal assessment of the particular evidence presented to it under that standard here. In *Atkins*, the United States Supreme Court left to the states the development of appropriate ways to enforce the constitutional prohibition against the execution of mentally retarded persons. *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242. In so doing, the High Court set forth the AAMR's definition of mental retardation as well as the American Psychiatric Association's definition set forth in DSM–IV and noted that both require the onset of functional limitations prior to age eighteen. *Id.* at 309 n. 3,

---

**9.** The Concurring and Dissenting Opinion attributes the absence of more objective measures of appellant's alleged mental retardation to the unavailability of testing at appellant's school. *See* Concurring and Dissenting at 653–54, 962 A.2d at 1191–92 (declaring that no tests or records available "due to the lack of a structured program designed to identify those students with mental retardation;" and declaring appellant was "not afforded the specialized expert attention, IQ tests, or adaptive assessments memorialized in school records"). These assumptions have no support in the record. It bears noting that one reason such objective measures may be missing is because parents, teachers, or others in a position to observe a child, perhaps saw no reason to pursue such testing. Furthermore, testing could be available but missed by a student due to, among other causes, truancy.

318, 122 S.Ct. 2242. This Court took the opportunity in *Miller* to establish appropriate criteria to determine if a capital defendant is mentally retarded. Consistently with *Atkins,* and the definitions referenced therein, we included as one of three factors onset before age eighteen.

The Concurring and Dissenting Opinion focuses, perhaps too sharply, on the lack of IQ testing as the alleged sole basis for the trial court's determination that appellant failed to establish onset prior to age eighteen. The trial court did not hold, and we do not suggest, that objective IQ testing occurring before age eighteen is required to prove mental retardation. Other factors were involved here. The Concurring and Dissenting Opinion marginalizes the trial court's more extensive factfinding, which included findings that appellant's school records contained no notations that he was considered mentally retarded; that his placement in special education classes, which he offered as objective proof of childhood mental retardation, could have been related to other factors such as behavioral issues or his poor school attendance; and that the number of objective medical risk factors appellant had could contribute to his current mental impairment (a relevant point because appellant's current impairments were offered as proof of lifelong impairment). In short, the trial court's decision which we affirm was not predicated upon perverting the *Atkins/Miller* standard into one only requiring objective IQ testing in childhood, but rather on all of the evidence, or lack thereof, that appellant suffered from mental retardation prior to the age of eighteen. Finally, the trial court was well aware of the reasons why the age of onset requirement is an important part of the test for mental retardation:

> One of the purposes for the "age of onset" element is to distinguish mental retardation from those forms of brain damage that may occur later in life such as mental impairment caused by head injury trauma, dementia or other similar conditions.
>
> The issue of brain injury occurring later in life is of principle [sic] concern in the instant case. The Defendant's expert, Dr. Bernstein, testified that Defendant has suffered

from several head traumas and acknowledged that this affects the Defendant's reasoning and deliberation. He also diagnosed the Defendant with mild dementia and vascular disease of the brain. Mr. Sedlock testified that the Defendant has suffered brain injury as a result of head trauma. The Commonwealth's expert, Dr. Wright[,] also made note of the Defendant's various head injuries occurring after the age of 18 and diagnosed the Defendant with possible dementia, cerebral vascular disease, and alcohol and substance abuse. According to Dr. Wright all of these conditions led to a decline in cognitive capacity of the Defendant.

A second rationale for the "age of onset" requirement is to ensure that defendants cannot feign mental retardation after being charged with a capital crime. Here the issue of malingering is also of concern. Dr. Wright testified that he was concerned about the Defendant's deceitfulness since he lied several times to him. Further, Dr. Wright testified that the Defendant was uncooperative and gave a poor effort on tests administered.

Trial Ct. Op., 1/24/07, at 12–14 (citations and footnotes omitted).

The record fully supports the trial court's conclusions, which were reached after a careful, thorough hearing. The trial court's considered analysis of the evidence presented by appellant and the Commonwealth is evident in the court's detailed opinion denying appellant's petition to bar the death penalty. We find no error in the trial court's analysis or conclusions on this issue.

## VII. Trial Court's Refusal to Allow Testimony of Mental Retardation Expert

Appellant next argues that the trial court erred in refusing to appoint an expert on mental retardation who could have testified at the *Atkins* hearing. Such an expert, appellant alleges, could have spoken to issues raised by the Commonwealth, such as that appellant had a commercial driver's license and lived independently. According to appellant, the purpose of such an expert would have been to "draw the line

between what a person who is not retarded may be able to do as compared to a person who is mildly mentally retarded." Appellant's Brief at 39. Appellant maintains that, without the testimony of such an expert, the trial court had no basis for evaluating whether appellant's adaptive abilities were consistent with those of mildly mentally retarded persons.

The Commonwealth argues in response that the court did not err refusing to appoint such an expert because the testimony would have been cumulative of the testimony provided by Sedlock and Dr. Bernstein. According to the Commonwealth, both of appellant's experts testified concerning appellant's adaptive behaviors or lack thereof in detail. As this Court stated in *Commonwealth v. Serge*, 586 Pa. 671, 896 A.2d 1170 (2006), *cert. denied*, 549 U.S. 920, 127 S.Ct. 275, 166 L.Ed.2d 211 (2006):

> The decision to appoint an expert witness is within the sound discretion of the trial court and will not be disturbed except for a clear abuse of that discretion. *United States ex rel Dessus v. Pennsylvania*, 316 F.Supp. 411 (E.D.Pa.1970), *affirmed*, 452 F.2d 557 (3rd Cir.1971), *cert. denied*, 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972); *Commonwealth v. Gelormo*, 327 Pa.Super. 219, 475 A.2d 765 (1984). There is no obligation on the part of the Commonwealth to pay for the services of an expert. *Commonwealth v. Williams*, 522 Pa. 287, 561 A.2d 714, 718 (1989) (citing *Commonwealth v. Box*, 481 Pa. 62, 391 A.2d 1316 (1978)); *Commonwealth v. Rochester*, 305 Pa.Super. 364, 451 A.2d 690 (1982). However, in a capital case, an accused is entitled to the assistance of experts necessary to prepare a defense. *United States ex rel. Dessus*, 316 F.Supp. at 418.

*Id.* at 1184–85. Our review of the record reveals that both Sedlock and Dr. Bernstein testified at length as to their opinions regarding appellant's limitations in adaptive skills. Thus, as the Commonwealth correctly argues, any additional expert testimony regarding appellant's adaptive skills would have been merely cumulative. Further, it is apparent that appellant was not prejudiced by the trial court's refusal to appoint the requested expert because the controlling finding

by the trial court was that appellant failed to establish onset of mental retardation by the age of eighteen, which is unrelated to his adult adaptive behaviors. Accordingly, the trial court did not abuse its discretion in refusing to appoint an additional expert to provide cumulative testimony.

### VIII. Imposition of the Death Penalty on a Retarded Person

Finally, appellant argues that it would constitute cruel and unusual punishment to subject him to the death penalty simply because he can present no IQ testing from his school years. Appellant contends that his present limitations, whether or not they began prior to age eighteen, should render him ineligible for the death penalty. His argument, in essence, is that a murderer who is mentally deficient to the same extent as a murderer who has been found to be mentally retarded should be similarly exempt from capital punishment. The trial court rejected this claim, finding that there is no national consensus that mentally deficient individuals should be entitled to the same exemption as those found to be mentally retarded. In addition, the court noted that the *Atkins* Court made it clear that not all defendants who claim to be mentally retarded fall within the range of mentally retarded offenders about whom there exists a national consensus against capital punishment. *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242.

Initially, we note that appellant frames this issue as "whether it is a violation of the United States **and Pennsylvania** Constitutions to impose the death penalty on an individual who is mentally deficient to the same degree as a person who has been labeled mentally retarded." Appellant's Brief at 41 (emphasis added). The only authority upon which appellant relies in forwarding this claim, however, is the U.S. Supreme Court's decision in *Atkins.* Indeed, appellant's only reference to the Pennsylvania Constitution is in his statement of the issue. Therefore, this issue is waived to the extent appellant purports to raise it under the Pennsylvania Constitution.

To the extent appellant raises this issue under the Eighth Amendment, we would not be inclined, in the absence of

legislative direction, to extend *Atkins* beyond its express command. *Atkins* imposed a national rule upon all of the States, removing the authority to impose the death penalty upon a narrow class of capital defendants. Notably, however, the High Court did not establish a national standard for mental retardation, thus recognizing (and implicitly approving) a certain amount of flexibility under the *Atkins* rule. This fact, we believe, weighs heavily against a unilateral judicial action extending *Atkins* to other scenarios, particularly where, as here, appellant offers no evidence of a national consensus for prohibiting the execution of those who are mentally deficient but who do not meet the definition of mentally retarded.

In this instance, applying the law as it presently exists, the trial court heard four days of testimony, including extensive testimony from two defense experts and several lay witnesses who testified on appellant's behalf. At the conclusion of that lengthy hearing, the trial court carefully and thoroughly examined and analyzed the evidence presented and concluded that appellant did not meet his burden of proving that he is mentally retarded such that *Atkins* bars imposition of the death penalty. As there is currently no prohibition on imposing the death penalty on a defendant who is mentally deficient but not mentally retarded, this claim must fail.

## IX. Statutory Review

Having reviewed all of appellant's claims, we conclude that relief is not warranted. Accordingly, this Court must affirm the sentence of death unless we determine that it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). After careful review of the trial record, we conclude that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial. Further, this sentence complies with 42 Pa.C.S. § 9711(c)(1)(iv), which mandates a sentence of death when the jury finds one or more aggravating circumstances that outweigh any mitigating circumstances. Lastly, pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), we find that the evidence was sufficient to support the aggra-

vating circumstances the jury found in imposing a sentence of death.

Accordingly, we affirm the verdicts and the sentence of death.[10]

Justice SAYLOR and EAKIN and Justice TODD and GREENSPAN join the opinion.

Justice BAER files a concurring and dissenting opinion in which Justice McCAFFERY joins.

Justice BAER, concurring and dissenting.

I join the Majority's resolution of Appellant's guilt phase claims. I dissent, however, from the Majority's rejection of Appellant's penalty phase argument that he is ineligible for the death penalty because he is mentally retarded. In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court declared that the execution of mentally retarded criminals violated the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* at 311, 122 S.Ct. 2242. The High Court left to the states the task of developing standards and procedures for determining whether a defendant was, in fact, mentally retarded. *Id.* at 317, 122 S.Ct. 2242. This Court undertook that task in *Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624 (2005). In an opinion by then-Chief Justice Cappy, relying upon the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th Ed.1992) and the American Association of Mental Retardation's treatise entitled Mental Retardation: Definition, Classification and Systems of Supports 1 (10th ed.2002), we determined that a defendant seeking to avoid the death penalty had to prove by a preponderance of the evidence: (1) that he possessed limited intellectual functioning; (2) that such limited intellectual functioning impacted his everyday life (that his adaptive functioning was substantially diminished by his intellectual impairment); and

10. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

(3) that the limited intellectual functioning impacting his adaptive functioning was apparent prior to his eighteenth birthday. *Miller*, 888 A.2d at 627. In this capital case, the pragmatic effect of the Majority's holding is that Appellant, and those similarly situated to him, can never prove mental retardation under the above matrix when records are not extant to illuminate his mental condition before his eighteenth birthday. Such analysis is at least unsupported, if not contradicted, by the overarching rationale of *Atkins* as well as *Miller*, and I dissent from it.

Prior to Appellant's trial for capital murder, he filed a petition seeking to preclude the Commonwealth from pursuing the death penalty, alleging that he had substantial intellectual impairment; that such impairment impacted his daily adaptive functioning; and that this disability was in existence prior to age eighteen. As the Majority describes in detail, during a four-day hearing, Appellant attempted to prove these premises, derived directly from the three-prong *Miller* test, by a preponderance of the evidence. In regard to the first element, defense psychologist Adam Sedlock administered an intelligence test and determined that Appellant scored an intelligence quotient (IQ) of 61–71, indicating that Appellant is functioning within the mild range of mental retardation. With regard to the second element, Appellant produced evidence that his adaptive skills are deficient. Finally, regarding the third element of *Miller*, that onset was before age eighteen, Appellant offered evidence that he was in special education classes until he dropped out of school in the tenth grade. Further, defense expert Dr. Lawson Frederick Bernstein, Jr., a clinical and forensic neuropsychiatrist, testified that IQ does not change over a lifetime. Based on Dr. Bernstein's testimony, Appellant's present IQ score, Appellant's school records, and interviews with Appellant's sister, defense expert Sedlock concluded that the onset of Appellant's mental retardation occurred prior to age eighteen.

In response, the Commonwealth, rather than addressing the substance of Appellant's case, focused on the lack of testing performed prior to Appellant's eighteenth birthday, and noted

the self-evident proposition that children can be placed in special education classes for many reasons other than mental retardation. Dr. Bruce Wright buttressed the Commonwealth's argument by testifying that the only means of definitively establishing the impairment of mental functioning prior to age eighteen is through objective testing that Appellant as a child was never provided.[1] N.T. 12/8/2006, 274.

After the hearing, the trial court analyzed the third element of *Miller*. Accepting the Commonwealth's assertions, the trial court found that because Appellant failed to offer IQ testing conducted prior to age eighteen, which the trial court believed was the best evidence of age of onset, he did not meet his burden. Further, the trial court noted that Appellant failed to produce school or psychological records proving that his mental retardation manifested itself before age eighteen. Accordingly, the Court rejected Appellant's claim premised on the third element of *Miller* alone, and declined to determine whether Appellant had established the first two elements of *Miller*. This Court's Majority accepts the trial court's rationale and determination.

Respectfully, I dissent. I believe that the Majority, through its affirmance of the trial court, imposes an impossible standard on certain defendants for whom there is no objective evidence originating prior to age eighteen. Where, as here, there was no IQ testing conducted before age eighteen and no school records identifying Appellant as mentally retarded, due to the lack of a structured program designed to identify those students with mental retardation,[2] the Majority's requirement

1. I acknowledge that the Commonwealth also argued that in accord with *Miller's* first two criteria, Appellant did not have limited intellectual functioning or maladaptive behavior. However, the trial court's decision and this Court's Majority Opinion both turn solely on Appellant's alleged failure to prove the third *Miller* prong by objective testing and diagnosis prior to age eighteen.

2. Ann Peters, the supervisor of special education for the Frazier School District, reviewed Appellant's school files and testified that at the time Appellant attended the school, there was no formalized evaluation procedure for placing students in special education classes. Placement in such classes was informal, and was not based on routine standardized testing. N.T. Nov. 27, 2006 at 56–57, 61–62.

of objective evidence originating before age eighteen precludes defendants such as Appellant from ever meeting their burden of showing mental retardation, and may well lead to the execution of mentally retarded defendants in violation of *Atkins* and *Miller*, if they were not fortunate enough to attend a school that tested for IQ and/or maladaptive behavior.

Neither *Atkins* nor *Miller* requires IQ testing or objective evidence of behavioral impairment before one's eighteenth birthday to prove age of onset. To require such tests from Appellant's childhood substantively redefines the third criteria of *Miller* to mandate production of childhood tests for objective intelligence and adaptive functioning, or to face execution, regardless of current realities. To say this is troubling is an understatement. Many defendants, such as Appellant, were not afforded the specialized expert attention, IQ tests, or adaptive assessments memorialized in school records, required by the Majority to corroborate their claim of mental retardation.[3]

**3.** The Majority observes that it is possible for a defendant to show age of onset before eighteen in the absence of objective testing from that time by offering school records, social service records, or psychological records to prove that mental retardation manifested before age eighteen. Here, however, according to the trial court and the Majority, Appellant failed to meet his burden of proof because nobody labeled him mentally retarded in his school records, he might have been placed in special education classes because of excessive absences, and his current mental impairments may be the result of something other than mental retardation.

Appellant's burden to prove age of onset is by a preponderance of the evidence, "that is, by a greater weight of the evidence." *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 242 (2007). Here, Appellant attempted to meet his burden and overcome the lack of objective testing or the characterization of mental retardation in his school records before his eighteenth birthday by offering expert opinions, as well as the testimony of family members about his adaptive limitations while in school. His experts opined that, considering his school records and contemporary IQ scores, his IQ-related deficiencies were present before age eighteen. Appellant's family members corroborated this conclusion, testifying that his adaptive limitations were present before his eighteenth birthday. In rejecting Appellant's evidence, the trial court focused on his failure to introduce an IQ test administered before age eighteen or to offer any illuminating school, social service, or psychological records, which, again, were extant prior to Appellant's eighteenth birthday, and the Majority affirms this decision. Notwith-

The third component of *Miller* was intended to differentiate between mental retardation and intellectual deficits that develop after age eighteen, typically due to brain injuries or brain diseases such as dementia.[4] It was never intended to be the draconian standard established by the Majority to eliminate the benefit of *Atkins* for legitimately mentally retarded individuals. Contrary to the trial court or the Majority, I believe that whatever evidence is put forward by an Appellant should be considered without the barrier of a talismanic test. Here, Appellant's expert Sedlock interviewed Appellant, Appellant's family, and reviewed Appellant's school records, and concluded, based on this evidence, that the age of onset of mental retardation was before eighteen. The trial court, and the Majority, has accepted the Commonwealth's position and that of its expert that absent objective evidence of origination of the symptoms of mental retardation prior to age eighteen, Appellant could not meet his burden. Conversely, I believe this case should be remanded to the trial court to assess whether in the absence of preclusive, objective criteria, and weighing all of the evidence put forward by Appellant and the Commonwealth, Appellant established mental retardation. I believe further that the trial court should analyze the two remaining elements of *Miller* so that upon the next appeal, this Court is in a position to determine whether the credible record evidence establishes mental retardation.

Justice McCAFFERY joins this concurring and dissenting opinion.

standing the Majority's protests to the contrary, I believe that the trial court and Majority have erected an insurmountable wall for defendants such as Appellant who were not tested or labeled through a structured, formal school procedure.

4. As noted by the Majority, unlike the circumstance of mental retardation, a national consensus has not been found regarding the propriety of the imposition of the death penalty against individuals whose intellectual deficits develop after age eighteen.