DICKINSON, Presiding Justice,
concurring in part and dissenting in part:
¶ 97. I agree that Dickerson’s conviction for capital murder should be affirmed. But because I believe that this Court has inadequately addressed the Eighth Amendment concerns expressed by the United States Supreme Court in Atkins v. Virginia, I would reverse Dickerson’s death sentence, and I respectfully dissent in part.
¶ 98. In Atkins v. Virginia, the United States Supreme Court ruled that the Eighth Amendment’s ban of cruel and. unusual punishment categorically prohibits the execution of the intellectually disabled.[13] Dickerson argues that he is intellectually disabled, and that the trial judge should have submitted that issue to the jury. I believe a majority of this Court agrees that the issue of intellectual disability should be submitted to a jury.
¶ 99. Dickerson also argues that the prohibition announced in Atkins should be extended to include other intellectually impaired persons who do not satisfy the medical criteria to be formally diagnosed as intellectually disabled but who suffer from similar impairments. I would conclude that this issue is properly resolved by submission to a sentencing-phase jury, and that we must revise our decision in Chase v. State[14] to address adequately the *40 Eighth Amendment concerns articulated in Atkins.
¶ 100. Death is different.[15] The permanent, irreversible nature of the punishment requires that we carefully scrutinize death-penalty proceedings for error, giving the benefit of every doubt to the offender.[16] And, while a jury’s complex responsibility is to apply the law to the facts of a particular case, appellate courts bear a duty to issue clear, consistent, understandable capital-punishment opinions that are as free as possible from ambiguity and the risk of arbitrary application. But as one authoritative legal publication has put it:
capital punishment jurisprudence, with its ambitious dicta and plurality opinions has become a metaphorist’s.playground: it is .a “tangled thicket,” a “haphazard maze,” a “veritable minefield,” a “morass.” [17]
¶ 101. No area of capital-punishment jurisprudence is more worthy of this criticism than the cases addressing intellectual disability. And while many of this Court’s decisions — including some penned by the author of this concurrence — have contributed fuel for the- metaphors, the seeds of this confusion lie' in the Atkins opinion itself. -

Atkins v. <CARET> Virginia

¶ 102. In 2002, the United States Supreme Court — applying what it appreciated to be the “evolving standards of decency that mark the progress of a maturing society” — declared that execution of intellectually disabled persons “is excessive and that the Constitution ‘places a substantive restriction on the State's power to take the life’ of [an intellectually disabled] offender.” [18] Simply -'stated, the Atkins Court held that the execution of intellectually disabled persons is unconstitutional-. And in doing so, the Atkins majority set out two reasons for the categorical exemption.

National Consensus

¶ 103. First, the Court declared it “fair to say that a national consensus has developed .against” executing intellectually disabled persons.[19] In discerning the national consensus, the Atkins Court found that the “clearest and most reliable objective evidence of contemporary values” was “the legislation enacted by the country’s legislatures.”[20] Since the Court’s 1989 opinion in Penry v. Lynaugh,[21]
eighteen states enacted legislation specifically banning the' death penalty for people with [intellectual disability], and similar bills were passed by at least one house of the legislature in at least three other states. The Atkins Court noted that while the number, of states excluding people with [intellectual disability] had increased significantly (only two had so at the time of Penny), not a single state had legislated in the opposite direction by reinstating the death penalty for such offenders. Taking account of *41 the twelve states that had abolished the death penalty altogether, execution of a person with [intellectual disability] was forbidden in thirty states in 2002. The federal death penalty statute also precluded death sentences for offenders with [intellectual disability].[22]
¶ 104. The Atkins Court observed that, “even in those states that allow the execution of [intellectually disabled] offenders, the practice is uncommon.”[23] For example, according to the Court, even in New Hampshire and New Jersey where such executions were allowed, “none [had] .been earned out in decades.”[24] And so, considering this empirical evidence, the Court declared it .“fair to say that a national consensus has developed against it.”[25]

Death-Penalty Jurisprudence

¶ 105. As its second reason for announcing the categorical exclusion, the Court drew reasons from its “death-penalty jurisprudence” that were “consistent with the legislative consensus that the [intellectually disabled] should be categorically excluded from execution,”[26] The Court found that executing intellectually disabled persons did not accomplish either of the justifications for the death penalty — retribution and deterrence — and that the “reduced capacity” of intellectually disabled persons presented an unacceptable risk of “false confessions,” a reduced ability to “make a persuasive showing of mitigation,” and a reduced ability “to give meaningful assistance to their counsel.”[27]
¶ 106. The Court went on to point out that intellectually disabled persons “are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes.”[28] And finally,- the Court worried that “reliance on [intellectual disability] as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury.”[29]
The Trouble With Atkins
¶ 107. After determining that the intellectually disabled were categorically ex-' empt from execution, the Atkins majority stated:
To the extent . there is serious disagreement about the execution of [intellectually disabled] offenders, it is in determining which offenders are in fact [intellectually disabled].... Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus.... “[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.”[30]
*42 ¶ 108. This passage is quite significant and of particular interest to state courts. While this Court has little to do with the skirmishes between the Atkins majority and dissents regarding the question of whether there exists a national consensus, it has everything to do with carrying out the decision’s mandate. We are left with the task of discerning what it is that we are constitutionally forbidden to do.
¶ 109. The passage quoted above has been read to say no more than that the only “serious disagreement about the execution of [intellectually disabled] offenders, [ ] is in determining which offenders are in fact [intellectually disabled].”[31] This isolated reading of the statement simply is not accurate. Courts have no more trouble determining “which offenders are in fact [intellectually disabled]” than they do in finding whose fingerprints are on the gun, or whose DNA was found at the scene. Experts testify, and the jury decides who it believes.
¶ 110. The next sentence is the critical one: “Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus.... ” This sentence establishes that the true inquiry is not so much about who is intellectually disabled, but about the “national consensus” and what persons — intellectually disabled or not — “fall within the range of intellectually disabled offenders about whom there is a national consensus.” In other words, some intellectually disabled persons will fall within that range, and some will not.
¶ 111. The problem lies in the absolute reality, completely overlooked by interpretations of the Atkins decision, that the label “mental retardation” or “intellectual disability” is of far less importance than the “national consensus” that persons who possess certain mental deficiencies and communication problems should not be executed.
¶ 112. I seriously doubt that the United States Supreme Court would have any concern about the execution of intellectually disabled persons if that label included an I.Q. of 90. The label is controlled by the mental-health community. Psychiatrists and psychologists are not judges, criminologists, or legislators. In developing and changing, from time to time, the definition of intellectual disability, they have no responsibility for what does and does not qualify a person for capital punishment.. Indeed, there is widespread disagreement over the proper definition of “mental retardation” or “intellectual disability,” and the various definitions are in a continual state of change.[32]
¶ 113. So it seems to me the problem is not — as many believe the Atkins majority stated in isolation — “in determining which offenders are in fact [intellectually disabled];” the problem is in making sure the legal definition of intellectual disability— which should be controlled by the courts, *43 and is not necessarily consistent with the clinical definition-is consistent with the concerns that led the Atkins Court to categorically exempt an entire class of people from the death penalty. This is the same path the courts took in developing a legal definition of insanity.
¶ 114. Rather than clearly defining for the state courts the constitutional limits and requirements for the death penalty, the Atkins majority left “to the states the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.” [33] I refuse to assume the Atkins majority meant the constitutional restriction to be no more than a label that is completely controlled by the mental-health community.
¶ 115. To illustrate — and bearing in mind that the mental-health community has complete control over its definitions— suppose the mental-health community raised the IQ threshold for mental disability from 75 to 90, and required only one, instead of the current two, deficiencies in adaptive functioning. I doubt a single justice on the Atkins Court, or this Court, would believe a “national consensus” exists to exclude from execution all intellectually disabled persons under that definition. And further, suppose the Mississippi Legislature decided to define intellectual disability as all persons with an IQ below 20. I doubt there would exist any reasonable view that persons with an IQ of 25-while not labeled intellectually disabled in Mississippi — are outside the Atkins Court’s “national consensus.”

Van Tran v. State

¶ 116. One case that illustrates the arbitrary notion that a mere label is all that should be required to qualify for the Atkins Court’s national consensus is Van Tran v. State, where the defendant — an immigrant from Vietnam — proved the necessary intellectual deficiency and deficits in two or more categories of functional adaptive skills.[34] But, because he was unable to produce an IQ test or other evidence that his condition had manifested before age eighteen (prior to age eighteen, Van Tran was in the jungles of Vietnam), the courts rejected his Atkins claim of exemption from execution.[35] And “Van Tran is not alone.”[36]
¶ 117. The mental-health community develops and refines the various requirements for mental-health conditions such as intellectual disability, with no responsibility or'obligation to the judiciary to ensure that its goals and definitions are consistent with judicial, constitutional concerns. So it seems that when the Atkins Court set forth the list of reasons and concerns that led to its decision, the Court simply assumed that persons who bore the label “intellectually disabled” would fit — and would continue to fit — within the group of persons about which it found a national consensus. But, given the changes in definition and the potential for future changes that are not subject to any judicial review, I have concluded that this Court can observe the constitutional restrictions set forth by the Atkins Court only by adopt- *44 tag a judicial definition of intellectual disability — much the same as we adopted a judicial definition of legal insanity — to be applied by juries for constitutional purposes.[37]

Chase v. State

¶ 118. In 2004, this Court, for the first time, attempted to apply Atkins in a post-conviction-relief case in which the petitioner’s verdict and sentence already had been affirmed. In Chase, we struggled to understand the Atkins majority’s intended application:
To fully appreciate and accept that Atkins exempts all [intellectually disabled] persons — even those who are minimally [intellectually disabled] — from execution, a careful reading of the majority opinion, as well as both dissents] is required. This is so because of ambiguous statements in the majority opinion which appear to conflict with other statements in ■the majority opinion, and with the understanding of the majority holding as expressed by [the dissents].[38]
We went on to point out the Court’s enigmatic language that continues to give us trouble today:
To the extent there is serious disagreement about the execution of [intellectually disabled] offenders, it is in determining which offenders are in fact [intellectually disabled].... Not all people who claim to be [intellectually disabled] will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus .... “[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.”[39]
¶ 119. After éxamining other statements in the Atkins majority, we concluded that it intended to grant “Eighth Amendment protection from execution to all [intellectually disabled] persons.”[40] We then fell into the Atkins trap of merely requiring a label defined by the mental-health community. We cited the same definitions cited in Atkins, and we set forth a procedure that ultimately required a finding that “[t]he defendant is [intellectually disabled], as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association.”[41]
¶ 120. I cannot help but conclude that our response to the Atkins imperative relied too heavily on the definitions provided by the mental-health community, without taking into account the constitutional concerns of Atkins, for which the mental-health community has no responsibility. So I would modify Chase by providing a judicial definition of intellectual disability to be used by our trial courts in determining which defendants meet the Atkins requirements for exemption from the death penalty.
¶ 121. I would hold that, in death-penalty cases where an accused pleads the defense of intellectual disability — and, prior to the sentencing trial, produces to the trial judge evidence creating reasonable doubt as whether he may be intellectually disabled — the accused may proceed on the *45 defense. In the sentencing phase, the State should bear the burden of proving to the satisfaction of the jury, beyond a reasonable doubt, that the offender is not intellectually disabled. I would hold that in all such cases the jury should be instructed as follows:
The court instructs you that pérsons who are intellectually disabled are ineligible for the death penalty. The State has the burden to prove beyond a reasonable doubt that the defendant is not intellectually disabled. In reaching your decision, you must use the following definition of intellectually disabled: Persons are intellectually disabled if they (1) have substantially reduced intellectual functioning or suffer from any mental defect or disease, (2) and that substantially reduced intellectual functioning, mental defect, or disease causes them to act out of impulse rather than a reasoned judgment of consequences, substantially reduces their ability to appreciate the wrongfulness of their actions, substantially reduces their ability to assist their counsel in their defense, or (in cases where the defendant has confessed) creates a substantial risk that the confession was false. If the State has not proven to your satisfaction, beyond any reasonable doubt, that [name of defendant] is not intellectually disabled, you must not return a verdict of death.
This procedure would proceed much the same way as the procedure for the jury’s determination of insanity and, like insanity, the above criteria may, but would not need to be, established by expert testimony. I now turn to the case before us.
¶ 122. The evidence presented with regard to Dickerson’s mental condition demonstrated a lack of reasoned judgment and impulsive behavior. Dickerson’s aunt explained that when he was a child he thought irrationally. Dr. Criss Lott, an expert in forensic psychology and neurop-sychology, noted that Dickerson had a pri- or diagnosis of schizophrenia, paranoid type. He scored Dickerson at an adjusted full-scale 71 IQ, in the range for intellectual disability. He diagnosed Dickerson as having a cognitive disorder based on deficits- in his “ability to plan, to problem solve, to anticipate, to organize.” He explained that people with similar deficits “don’t anticipate well; -they’re very impulsive; they don’t know how to-inhibit or delay a response....” He noted that Dickerson would struggle to adapt to external forces that interfere with a plan and would tend to respond impulsively.
¶ 123. Dr. Lott explained that Dickerson has at one time or another received diagnoses of schizophrenia, paranoid type; major-depressive disorder; and personality disorders with narcissistic features and has been prescribed antipsychotic medications. Lott also found that Dickerson has a cognitive disorder. That- disorder whs evidenced by Dickerson’s deficits in executive function, his ability to anticipate, problem-solve, and understand delayed gratification. These deficits inhibit one’s ability' to anticipate consequences, learn from mistakes, and to respond in a rational and nonimpulsive manner.
¶ 124. Dr. Julie Schroeder summarized executive functioning, stating:
Executive function is kind of the CEO for our brain. There are activities that are going on in our brains that ... assist us in ... planning and initiating tasks independently and bringing them to a conclusion, anticipating possible outcomes of those goals or objectives and the consequences of behavior. And it also helps us 'to maintain our self control and assess our behavior to détermine whether or not we are behaving as one would expect us to behave.
*46 She explained that Dickerson’s limitations in executive functioning particularly hampered his impulse control. She also explained the connection between deficits in executive functioning and criminal behavior:
[P]rolonged stress is probably the most important thing because it disrupts attention and judgment and other behaviors that are related to executive function .... And stress is a particularly important issue any time we’re dealing with someone with mental health issues.
She also explained that Dickerson scored in the tenth percentile in verbal comprehension, second percentile in perceptual reasoning, ninth percentile in working memory, and fifth percentile in processing speed.
¶ 125. I would find that Dickerson presented sufficient evidence to put his intellectual disability under the standards I have just articulated in doubt. I would vacate his death sentence and remand this case to the circuit court for a new sentencing proceeding, where Dickerson would be permitted to submit evidence of his potential intellectual disability to a jury. Any other result fails to give the Atkins decision its full force.
KITCHENS AND KING, JJ., JOIN THIS OPINION. CHANDLER, J., JOINS THIS OPINION IN PART.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT

Curtis Giovanni Flowers v. State, 158 So.3d 1009 (Miss.2014). * following remand.
Caleb Corrothers v. State, 148 So.3d 278 (Miss.2014).
Jason Lee Keller v. State, 138 So.3d 817 (Miss.2014).
Leslie Galloway III v. State, 122 So.3d 614 (Miss.2013).
Bobby Batiste v. State, 121 So.3d 808 (Miss.2013).
Roger Lee Gillett v. State, 56 So.3d 469 (Miss.2010).
Moffett v. State, 49 So.3d 1073 (Miss.2010).
Pitchford v. State, 45 So.3d 216 (Miss.2010).
Goff v. State, 14 So.3d 625 (Miss.2009).
Wilson v. State, 21 So.3d 572 (Miss.2009).
Chamberlin v. State, 989 So.2d 320 (Miss.2008).
Loden v. State, 971 So.2d 548 (Miss.2007).
King v. State, 960 So.2d 413 (Miss.2007).
Bennett v. State, 933 So.2d 930 (Miss.2006).
Havard v. State, 928 So.2d 771 (Miss.2006).
Spicer v. State, 921 So.2d 292 (Miss.2006).
Hodges v. State, 912 So.2d 730 (Miss.2005).
Walker v. State, 913 So.2d 198 (Miss.2005).
Le v. State, 913 So.2d 913 (Miss.2005).
Brown v. State, 890 So.2d 901 (Miss.2004).
Powers v. State, 883 So.2d 20 (Miss.2004)
Branch v. State, 882 So.2d 36 (Miss.2004).
Scott v. State, 878 So.2d 933 (Miss.2004).
Lynch v. State, 877 So.2d 1254 (Miss.2004).
*47 Dycus v. State, 875 So.2d 140 (Miss.2004).
Byrom v. State, 863 So.2d 836 (Miss.2003).
Howell v. State, 860 So.2d 704 (Miss.2003).
Howard, v. State, 853 So.2d 781 (Miss.2003).
Walker v. State, 815 So.2d 1209 (Miss.2002). * following remand.
Bishop v. State, 812 So.2d 934 (Miss.2002).
Stevens v. State, 806 So.2d 1031 (Miss.2002).
Grayson v. State, 806 So.2d 241 (Miss.2002).
Knox v. State, 805 So.2d 527 (Miss.2002).
Simmons v. State, 805 So.2d 452 (Miss.2002).
Berry v. State, 802 So.2d 1033 (Miss.2001).
Snow v. State, 800 So.2d 472 (Miss.2001).
Mitchell v. State, 792 So.2d 192 (Miss.2001).
Puckett v. State, 788 So.2d 752 (Miss.2001). * following remand.
Goodin v. State, 787 So.2d 639 (Miss.2001).
Jordan v. State, 786 So.2d 987 (Miss.2001).
Manning v. State, 765 So.2d 516 (Miss.2000). * following remand.
Eskridge v. State, 765 So.2d 508 (Miss.2000).
McGilberry v. State, 741 So.2d 894 (Miss.1999).
Puckett v. State, 737 So.2d 322 (Miss.1999). * remanded for Batson hearing.
Manning v. State, 735 So.2d 323 (Miss.1999). * remanded for Batson hearing.
Hughes v. State, 735 So.2d 238 (Miss.1999).
Turner v. State, 732 So.2d 937 (Miss.1999).
Smith v. State, 729 So.2d 1191 (Miss.1998).
Burns v. State, 729 So.2d 203 (Miss.1998).
Jordan v. State, 728 So.2d 1088 (Miss.1998).
Gray v. State, 728 So.2d 36 (Miss.1998).
Manning v. State, 726 So.2d 1152 (Miss.1998).
Woodward v. State, 726 So.2d 524 (Miss.1997).
Bell v. State, 725 So.2d 836 (Miss.1998).
Evans v. State, 725 So.2d 613 (Miss.1997).
Brewer v. State, 725 So.2d 106 (Miss.1998).
Crawford v. State, 716 So.2d 1028 (Miss.1998).
Doss v. State, 709 So.2d 369 (Miss.1996).
Underwood v. State, 708 So.2d 18 (Miss.1998).
Holland v. State, 705 So.2d 307 (Miss.1997).
Wells v. State, 698 So.2d 497 (Miss.1997).
Wilcher v. State, 697 So.2d 1087 (Miss.1997).
Wiley v. State, 691 So.2d 959 (Miss.1997).
Brown v. State, 690 So.2d 276 (Miss.1996).
Simon v. State, 688 So.2d 791 (Miss.1997).
Jackson v. State, 684 So.2d 1213 (Miss.1996).
*48 Williams v. State, 684 So.2d 1179 (Miss.1996).
Davis v. State, 684 So.2d 643 (Miss.1996).
Taylor v. State, 682 So.2d 359 (Miss.1996).
Brown v. State, 682 So.2d 340 (Miss. 996).
Blue v. State, 674 So.2d 1184 (Miss.1996).
Holly v. State, 671 So.2d 32 (Miss.1996).
Walker v. State, 671 So.2d 581 (Miss.1995).
Russell v. State, 670 So:2d 816 (Miss.1995).
Ballenger v. State, 667 So.2d 1242 (Miss.1995).
Davis v. State, 660 So.2d 1228 (Miss.1995).
Carr v. State, 655 So.2d 824 (Miss.1995).
Mack v. State, 650 So.2d 1289 (Miss.1994).
Chase v. State, 645 So.2d 829 (Miss.1994).
Foster v. State, 639 So.2d 1263 (Miss.1994).
Conner v. State, 632 So.2d 1239 (Miss.1993).
Hansen v. State, 592 So.2d 114 (Miss.1991).
*Shell v. State, 554 So.2d 887 (Miss.1989); Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding; Shell v. State, 595 So.2d 1323 (Miss.1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss.1989).
Minnick v. State, 551 So.2d 77 (Miss.1989).
* Pinkney v. State, 538 So.2d 329 (Miss.1989); Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding; Pinkney v. State, 602 So.2d 1177 (Miss.1992) remanding for new sentencing hearing.
* Clemons v. State, 535 So.2d 1354 (Miss.1988); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding; Clemons v. State, 593 So.2d 1004 (Miss.1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss.1988).
Nixon v. State, 533 So.2d 1078 (Miss.1987).
Cole v. State, 525 So.2d 365 (Miss.1987).
Lockett v. State, 517 So.2d 1346 (Miss.1987).
Lockett v. State, 517 So.2d 1317 (Miss.1987).
Faraga v. State, 514 So.2d 295 (Miss.1987).
* Jones v. State, 517 So.2d 1295 (Miss.1987); Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding; Jones v. State, 602 So.2d 1170 (Miss.1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss.1986).
Johnson v. State, 477 So.2d 196 (Miss.1985).
Gray v. State, 472 So.2d 409 (Miss.1985).
Cabello v. State, 471 So.2d 332 (Miss.1985).
Jordan v. State, 464 So.2d 475 (Miss.1985).
*49 Wilcher v. State, 455 So.2d 727 (Miss.1984).
Billiot v. State, 454 So.2d 445 (Miss.1984).
Stringer v. State, 454 So.2d 468 (Miss.1984).
Dufour v. State, 453 So.2d 337 (Miss.1984).
Neal v. State, 451 So.2d 743 (Miss.1984).
Booker v. State, 449 So.2d 209 (Miss.1984).
Wilcher v. State, 448 So.2d 927 (Miss.1984).
Caldwell v. State, 443 So.2d 806 (Miss.1983).
Irving v. State, 441 So.2d 846 (Miss.1983).
Tokman v. State, 435 So.2d 664 (Miss.1983).
Leatherwood v. State, 435 So.2d 645 (Miss.1983).
Hill v. State, 432 So.2d 427 (Miss.1983).
Pruett v. State, 431 So.2d 1101 (Miss.1983).
Gilliard v. State, 428 So.2d 576 (Miss.1983).
Evans v. State, 422 So.2d 737 (Miss.1982).
King v. State, 421 So.2d 1009 (Miss.1982).
Wheat v. State, 420 So.2d 229 (Miss.1982).
Smith v. State, 419 So.2d 563 (Miss.1982).
Johnson v. State, 416 So.2d 383 (Miss.1982).
Edwards v. State, 413 So.2d 1007 (Miss.1982).
Bullock v. State, 391 So.2d 601 (Miss.1980).
Reddix v. State, 381 So.2d 999 (Miss.1980).
Jones v. State, 381 So.2d 983 (Miss.1980).
Culberson v. State, 379 So.2d 499 (Miss.1979).
Gray v. State, 375 So.2d 994 (Miss.1979).
Jordan v. State, 365 So.2d 1198 (Miss.1978).
Voyles v. State, 362 So.2d 1236 (Miss.1978).
Irving v. State, 361 So.2d 1360 (Miss.1978).
Washington v. State, 361 So.2d 61 (Miss.1978).
Bell v. State, 360 So.2d 1206 (Miss.1978).
DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCING PHASE
Manning v. State, 158 So.3d 302 (Miss.2015).
Byrom v. State, 2014-DR-00230-SCT (April 3, 2014) (order).
Ross v. State, 954 So.2d 968 (Miss.2007).
Flowers v. State, 947 So.2d 910 (Miss.2007).
Flowers v. State, 842 So.2d 531 (Miss.2003).
Randall v. State, 806 So.2d 185 (Miss.2002).
Flowers v. State, 773 So.2d 309 (Miss.2000).
Edwards v. State, 737 So.2d 275 (Miss.1999).
Smith v. State, 733 So.2d 793 (Miss.1999).
Porter v. State, 732 So.2d 899 (Miss.1999).
*50 Kolberg v. State, 704 So.2d 1307 (Miss.1997).
Snelson v. State, 704 So.2d 452 (Miss.1997).
Fuselier v. State, 702 So.2d 388 (Miss.1997).
Howard v. State, 701 So.2d 274 (Miss.1997).
Lester v. State, 692 So.2d 755 (Miss.1997).
Hunter v. State, 684 So.2d 625 (Miss.1996).
Lanier v. State, 684 So.2d 93 (Miss.1996).
Giles v. State, 650 So.2d 846 (Miss.1995).
Duplantis v. State, 644 So.2d 1235 (Miss.1994).
Harrison v. State, 635 So.2d 894 (Miss.1994).
Butler v. State, 608 So.2d 314 (Miss.1992).
Jenkins v. State, 607 So.2d 1171 (Miss.1992).
Abram v. State, 606 So.2d 1015 (Miss.1992).
Balfour v. State, 598 So.2d 731 (Miss.1992).
Griffin v. State, 557 So.2d 542 (Miss.1990).
Bevill v. State, 556 So.2d 699 (Miss.1990).
West v. State, 553 So.2d 8 (Miss.1989).
Leatherwood v. State, 548 So.2d 389 (Miss.1989).
Mease v. State, 539 So.2d 1324 (Miss.1989).
Houston v. State, 531 So.2d 598 (Miss.1988).
West v. State, 519 So.2d 418 (Miss.1988).
Davis v. State, 512 So.2d 1291 (Miss.1987).
Williamson v. State, 512 So.2d 868 (Miss.1987).
Foster v. State, 508 So.2d 1111 (Miss.1987).
Smith v. State, 499 So.2d 750 (Miss.1986).
West v. State, 485 So.2d 681 (Miss.1985).
Fisher v. State, 481 So.2d 203 (Miss.1985).
Johnson v. State, 476 So.2d 1195 (Miss.1985).
Fuselier v. State, 468 So.2d 45 (Miss.1985).
West v. State, 463 So.2d 1048 (Miss.1985).
Jones v. State, 461 So.2d 686 (Miss.1984).
Moffett v. State, 456 So.2d 714 (Miss.1984).
Lanier v. State, 450 So.2d 69 (Miss.1984).
Laney v. State, 421 So.2d 1216 (Miss.1982).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss.1989).
Wheeler v. State, 536 So.2d 1341 (Miss.1988).
White v. State, 532 So.2d 1207 (Miss.1988).
Bullock v. State, 525 So.2d 764 (Miss.1987).
Edwards v. State, 441 So.2d 84 (Miss.1983).
*51 Dycus v. State, 440 So.2d 246 (Miss.1983).
Coleman v. State, 378 So.2d 640 (Miss.1979).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
Fulgham v. State, 46 So.3d 315 (Miss.2010).
Rubenstein v. State, 941 So.2d 735 (Miss.2006).
King v. State, 784 So.2d 884 (Miss.2001).
Walker v. State, 740 So.2d 873 (Miss.1999).
Watts v. State, 733 So.2d 214 (Miss.1999).
West v. State, 725 So.2d 872 (Miss.1998).
Smith v. State, 724 So.2d 280 (Miss.1998).
Berry v. State, 703 So.2d 269 (Miss.1997).
Booker v. State, 699 So.2d 132 (Miss.1997).
Taylor v. State, 672 So.2d 1246 (Miss.1996).
* Shell v. State, 554 So.2d 887 (Miss.1989); Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding; Shell v. State 595 So.2d 1323 (Miss.1992) remanding for new sentencing hearing.
* Pinkney v. State, 538 So.2d 329 (Miss.1989); Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding; Pinkney v. State, 602 So.2d 1177 (Miss.1992) remanding for new sentencing hearing.
* Clemons v. State, 535 So.2d 1354 (Miss.1988); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding; Clemons v. State, 593 So.2d 1004 (Miss.1992) remanding for new sentencing hearing.
* Jones v. State, 517 So.2d 1295 (Miss.1987); Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding; Jones v. State, 602 So.2d 1170 (Miss.1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss.1992).
Holland v. State, 587 So.2d 848 (Miss.1991).
Willie v. State, 585 So.2d 660 (Miss.1991).
Ladner v. State, 584 So.2d 743 (Miss.1991).
Mackbee v. State, 575 So.2d 16 (Miss.1990).
Berry v. State, 575 So.2d 1 (Miss.1990).
Turner v. State, 573 So.2d 657 (Miss.1990).
State v. Tokman, 564 So.2d 1339 (Miss.1990).
Johnson v. State, 547 So.2d 59 (Miss.1989).
Williams v. State, 544 So.2d 782 (Miss.1989); sentence aff'd 684 So.2d 1179 (1996).
Lanier v. State, 533 So.2d 473 (Miss.1988).
Stringer v. State, 500 So.2d 928 (Miss.1986).
Pinkton v. State, 481 So.2d 306 (Miss.1985).
Mhoon v. State, 464 So.2d 77 (Miss.1985).
Cannaday v. State, 455 So.2d 713 (Miss.1984).
Wiley v. State, 449 So.2d 756 (Miss.1984); resentencing affirmed, Wiley v. State, 484 So.2d 339 (Miss.1986); cert. de *52 nied, Wiley v. Mississippi, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 610 (1988); resentencing ordered, Wiley v. State, 635 So.2d 802 (Miss.1993) following writ of habeas corpus issued pursuant to Wiley v. Puckett, 969 F.2d 86, 105-106 (5th Cir.1992); resentencing affirmed.
Williams v. State, 445 So.2d 798 (Miss.1984). *Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
(Revised June 15, 2015.)

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. Chase v. State, 873 So.2d 1013 (Miss.2004).

. Randall v. State, 806 So.2d 185, 200 (Miss.2001).

. Id.

. Note, Implementing Atkins, 116 Harv. L.Rev. 2565, 2566 (2003) (internal citations omitted).

. Atkins, 536 U.S. at 321, 122 S.Ct. 2242 (citing Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).

. Atkins, 536 U.S. at 304, 122 S.Ct. 2242.

.Id. at 312, 122 S.Ct. 2242 (internal citations omitted).

. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) abrogated by Atkins, 536 U.S. at 304, 122 S.Ct. 2242 (allowing intellectual disability to be considered as a mitigating factor, but refusing to categorically exclude intellectually disabled persons from the death penalty).

. Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L.Rev. gll, 812 (2006-2007) (internal citations omitted).

. Atkins, 536 U.S. at 316, 122 S.Ct. 2242.

. Id.

. Id.

. Id. at 318, 122 S.Ct. 2242 (citing Coker v. Georgia, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)) ("In addition to objective evidence, the Constitution contemplates that this Court will bring its own judgment to bear by asking whether there is reason to agree or disagree with the judgment reached by the citizenry and its legislatures.”).

. Atkins, 536 U.S. at 318-21, 122 S.Ct. 2242.

. Id. at 320-21, 122 S.Ct. 2242.

. Id. at 321, 122 S.Ct. 2242.

. Id, at 317, 122 S.Ct. 2242 (quoting Ford, 477 U.S. at 405, 416-17, 106 S.Ct. 2595).

. Atkins, 536 U.S. at 317, 122 S.Ct. 2242.

. To be clear, I do not mean to criticize the mental-health community’s definitions of intellectual disability, or that those definitions change from time to time. Psychologists and psychiatrists adopt and amend definitions of intellectual disability to best serve their professional purposes of medical diagnosis and treatment. But the constitutional concerns are with the symptoms — not necessarily the label — of intellectual disability. I simply suggest that we should make sure that changes in the mental-health community's views of what is required for the label do not expand or contract the class of persons exempt from the death penalty under Atkins.

. Atkins, 536 U.S. at 317, 122 S.Ct. 2242 (quoting Ford, 477 U.S. at 405, 416-17, 106 S.Ct. 2595).

. Stephen J. Mulroy, Execution by Accident: Evidentiary and Constitutional Problems with the "Childhood Onset" Requirement in Atkins Claims, 37 Vt. L.Rev. 591, 592-93 (Spring 2013).

. Id.

. Id. at 593 n. 15 (citing Walton v. Johnson 440 F.3d 160, 177-78 (4th Cir.2006); Burns v. State, 944 So.2d 234, 249 (Fla.2006); Commonwealth v. VanDivner, 599 Pa. 617, 962 A.2d 1170, 1188-89 (2009); State v. Strode, 232 S.W.3d 1, 17 (Tenn.2007)).

. Once again, my purpose here is not to criticize the definitions adopted by mental-health professionals. Instead, I simply adopt a definition that is consistent with the Atkins Court’s requirements, and that serves our role as jurists — to enforce the Eighth Amendment’s ban of cruel and unusual punishment.

. Chase, 873 So.2d at 1026.

. Id. at 1026 (quoting Atkins, 53'6 U.S. at 317, 122 S.Ct. 2242) (emphasis added).

. Chase, 873 So.2d at 1027.

. Id. at 1029 (emphasis added).

 Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.