J-S50036-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

COMMONWEALTH OF PENNSYLVANIA

v.

JAMES W. VANDIVNER,

Appellant.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 295 WDA 2018

Appeal from the PCRA Order, January 17, 2014,
in the Court of Common Pleas of Fayette County,
Criminal Division at No(s): CP-26-CR-0001229-2004.

BEFORE: BOWES, J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.: FILED DECEMBER 31, 2018

James W. VanDivner appeals from the order denying his first petition for relief pursuant to the Post Conviction Relief Act ("PCRA"). 42 Pa.C.S.A. §§ 9541-9546. This appeal comes to us after our Supreme Court's remand. For the reasons that follow, we affirm in part and vacate in part.

VanDivner was originally sentenced to death for killing his former girlfriend, Michelle Cable ("the victim"). In his direct appeal, our Supreme Court summarized the pertinent facts as follows:

> Jessica Cable, [her brother, Billy,] and her mother [the victim], lived at 100 East Second Street, Grindstone, Fayette County. On July 5, 2004, Jessica was babysitting at a neighbor's home. Between 8:30 and 9:00 p.m., Jessica saw [VanDivner] driving in the direction of her home and immediately ran home. When she arrived, she saw [VanDivner] get out of his vehicle and walk to the back porch of her home. As Jessica followed, [VanDivner]

entered the home through the back door, and, while walking through the home, encountered a family friend, Larry Newman, in the living room. [VanDivner] asked Larry where [the victim] was, and Larry pointed to the front door. [VanDivner] then opened the door and walked onto the sun porch.

On the steps leading to the sun porch from the outside, [VanDivner] met [the victim] and her son, Billy Cable. As [VanDivner] walked onto the porch, Billy told him, "Dude, get off of my property." [VanDivner] then pointed a gun at [the victim], at which point Billy pounced on [VanDivner] in an attempt to wrestle the gun from his hand. [VanDivner] managed to keep the gun and pointed it at Larry Newman's head. Larry's relative, Kenneth Newman, then rushed [VanDivner] and the gun fired. [VanDivner], who still had the gun, walked quickly to [the victim] and told her he was going to kill her. He grabbed her by the hair, shot her in the head, and, as she fell to the ground, stated, "There, you bitch, I said I was going to kill you." [VanDivner] smiled and walked away. A motorist who was passing by saw [VanDivner] grab [the victim] by the hair and shoot her in the head.

Meanwhile, after unsuccessfully attempting to take the gun from [VanDivner], Billy had gone inside the home to look for a weapon to protect his family. When he was unable to find a weapon, he left the home. As he stepped off the back porch, Billy saw [VanDivner] walking toward him with a gun in his hand. [VanDivner] pointed the gun at Billy, who turned to run away. [VanDivner] shot Billy in the neck and then left the scene. Police subsequently apprehended [VanDivner] in a field and recovered a Jennings J22 handgun. As [VanDivner] was being taken into an interview room at the Pennsylvania State Police barracks, he blurted out to Trooper James Monkelis, "This is a death penalty case and I don't want the needle, life for a life. Tell the DA I will plead guilty to life. I would have killed myself if I knew [the victim] was dead."

On July 8, 2004, Dr. Cyril Wecht performed an autopsy on [the victim] and determined that the manner of death was homicide in that she "died as a result of anoxic and cephalopathy, diminution of oxygen to the brain tissue with degeneration, early necrosis, death of the brain tissue,

produced as a result of the gunshot wound to the head." Dr. Wecht recovered the bullet from [the victim's] brain and provided it to the State Police for analysis. Corporal David J. Burlingame, an expert in the field of firearm and toolmark examination determined that the bullet recovered from [the victim's] brain was fired from the Jennings 22 handgun found in [VanDivner's] possession at the time of his apprehension.

Commonwealth v. VanDivner, 962 A.2d 1170, 1173-74 (Pa 2009) ("VanDivner I').

Our Supreme Court further summarized the procedural history following VanDivner's arrest as follows:

Prior to trial, [VanDivner] filed a petition to bar the death penalty, alleging that he is [intellectually disabled] and has significant limitations in adaptive skills. He argued that, pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the execution of [an intellectually disabled] person constitutes cruel and unusual punishment and requested a pretrial hearing to determine whether the death penalty should be barred in this instance. [The Honorable Gerald R. Solomon] held a four-day hearing on [VanDivner's] petition at which [VanDivner] presented the testimony of two expert witnesses and several lay witnesses, and the Commonwealth offered the testimony of a psychiatrist and an official of the Department of Transportation. Judge Solomon determined that [VanDivner] failed to meet his burden of proving that his limitations, if any, began before he was 18 years of age, as required by the standards for determining [intellectual disability] endorsed by this Court in Commonwealth v. Miller, 585 Pa. 144, 888 A.2d 624 (2005). Thus, based upon [VanDivner's] failure to establish this element, the court denied the petition.

A jury found [VanDivner] guilty of the first-degree murder of [the victim], criminal attempt to commit criminal homicide [and aggravated assault] with respect to Billy and the aggravated assault of Larry Newman. At the penalty phase hearing, the Commonwealth presented evidence of

- 3 -

two aggravating circumstances: (1) that, in the commission of the offenses [VanDivner] knowingly created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7); and (2) that [VanDivner] had a significant history of felony convictions involving the use or threat of violence, id. § 9711(d)(9). The jury found both aggravating circumstances and one mitigating circumstance related to [VanDivner's] character and the circumstances of his offense, id. § 9711(e)(8) (the "catchall" mitigator), and determined that the two aggravating circumstances outweighed the mitigating circumstance. Thus, the jury returned a sentence of death. On February 12, 2007, the trial court formally imposed the death sentence as well as a consecutive sentence of 20 to 40 years for the attempted homicide of Billy Cable, [a consecutive 10 to 20 years for the aggravated assault of Billy Cable,] and a sentence of 10 to 20 years to run consecutively to [VanDivner's] sentence for first-degree murder and attempted murder, for the aggravated assault of Larry Newman.

VanDivner, 962 A.2d at 1174-75.[1]

VanDivner filed a direct appeal to our Supreme Court in which he raised eight issues, including a challenge to the sufficiency and weight of the evidence supporting his convictions, and three instances of trial court error— limiting the testimony of his psychological expert, Adam Sedlock; determining that VanDivner was not intellectually disabled; and failing to appoint an expert

_____

[1] In the subsequent decisions in this case, our Supreme Court explained its use of the term "intellectually disabled" instead of "mentally retarded." See Commonwealth v. VanDivner, 130 A.3d 676, 679 n.1 (Pa. 2013) ("VanDivner II"); Commonwealth v. VanDivner, 178 A.3d 108, 110 n.1 ((Pa. 2018) ("VanDivner III"). We shall use the term "intellectually disabled" throughout this memorandum.

on intellectual disability who could have testified at the Atkins[2] hearing. Finding no merit to any of VanDivner's claims, our Supreme Court affirmed VanDivner's death sentence.[3]

On July 20, 2010, VanDivner filed a pro se PCRA petition. The PCRA court appointed counsel, who twice filed amended petitions raising numerous issues, including claims of ineffective assistance of trial counsel and a claim involving VanDivner's mental capacity. Following four days of hearings, the PCRA court denied post-conviction relief. VanDivner then filed a timely appeal to our Supreme Court.[4]

The Court first addressed VanDivner's ineffective assistance claim involving his ineligibility for the death penalty pursuant to Atkins/Miller. Following two remands so that the PCRA court could explain its reasoning vis-à-vis the three prongs of the ineffective assistance of counsel test, our Supreme Court ultimately concluded that

> the PCRA court's determination that [VanDivner] failed to prove that he has significant adaptive limitations—which, in combination with his limited intellectual functioning and

---

[2] See Atkins v. Virginia, 536 U.S. 304 (2002); see also Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005) (establishing procedure for applying the decision in Atkins in Pennsylvania).

[3] Justice Baer, in a concurring and dissenting opinion joined by Justice McCaffery, took issue with the Majority's rejection of VanDivner's claim that he is ineligible for the death penalty because he is intellectually disabled.

[4] The Pennsylvania Supreme Court has exclusive jurisdiction over appeals from the grant or denial of post-conviction relief in death penalty cases. 42 Pa.C.S.A. § 9546(d).

prior to age 18 onset, would render him ineligible for the death penalty under [Atkins/Miller]—is unsupported in both law and fact.

VanDivner, 178 A.3d 108, 122 (Pa. 2018). Our Supreme Court further concluded that "trial counsel's performance was the result of insufficient investigation, and not any reasonable strategy" and that VanDivner established the requisite prejudice. Id. at 130. Finding he met his burden on his ineffectiveness claim, the Court therefore, reduced VanDivner's judgment of sentence from a death sentence to a life sentence and transferred VanDivner's remaining PCRA claims to this Court for disposition. Id.[5]

VanDivner raises the following issues:

I. Were trial counsel ineffective for failing to discover and present the testimony of multiple eyewitnesses who each supported a degree of guilt lesser than first-degree [murder]?

II. Were trial counsel ineffective for failing to introduce already-available evidence on diminished capacity?

III. Were trial counsel ineffective for failing to investigate and develop the available evidence which supported a voluntary manslaughter instruction that trial counsel had requested?

IV. Did the PCRA court err by not permitting VanDivner to amend his petition to include Brady violations first revealed during the PCRA hearing? Did those Brady violations deprive VanDivner of a fair trial?

_____

[5] See Commonwealth v. Gibson, 925 A.2d 167, 171 (Pa. 2007)(explaining that non-capital PCRA cases are within the jurisdiction of the Superior Court).

- 6 -

> V. Did the trial court violate double jeopardy in sentencing VanDivner for both the attempted homicide and aggravated assault of Billy Cable?
>
> VI. Is VanDivner entitled to relief because of the cumulative prejudicial effect of all of errors?

VanDivner's Brief at 3.

Our scope and standard of review is well settled:

> In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions de novo.

Commonwealth v. Reyes-Rodriguez, 111 A.3d 775, 779 (Pa. Super. 2015) (citations omitted).

VanDivner's first three issues allege the ineffective assistance of trial counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish, by a preponderance of the evidence, that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." Id. This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no

reasonable strategic basis for his or her action or inaction; and (3) counsel's act or omission prejudiced the petitioner. Id. at 533.

As to the first prong, "[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief." Commonwealth v. Stewart, 84 A.3d 701, 707 (Pa. Super. 2013) (en banc). "Whether the facts rise to the level of arguable merit is a legal determination.'" Id. (citing Commonwealth v. Saranchak, 866 A.2d 292, 304 n.14 (Pa. 2005).

As to the second prong of this test, trial counsel's strategic decisions cannot be the subject of a finding of ineffectiveness if the decision to follow a particular course of action was reasonably based and was not the result of sloth or ignorance of available alternatives. Commonwealth v. Collins, 545 A.2d 882, 886 (Pa. 1988). Counsel's approach must be "so unreasonable that no competent lawyer would have chosen it." Commonwealth v. Ervin, 766 A.2d 859, 862-63 (Pa. Super. 2000) (citation omitted). A petitioner asserting ineffectiveness based upon trial strategy must demonstrate that the "alternatives not chosen offered a potential for success substantially greater than the tactics utilized." Commonwealth v. Clark, 626 A.2d 154, 157 (Pa. 1993). "We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he [or she] may have taken." Stewart, 84 A.3d at 707. A PCRA petitioner is not entitled to post-conviction relief simply because a chosen strategy was unsuccessful. Commonwealth v. Buksa, 655 A.2d 576, 582 (Pa. Super. 1995).

As to the third prong of the test for ineffectiveness, "[p]rejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Stewart, 84 A.3d at 707. "A reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Commonwealth v. Rathfon, 899 A.2d 365, 370 (Pa. Super. 2006).

Finally, when considering an ineffective assistance of counsel claim, the PCRA court "is not required to analyze these [prongs] in any particular order of priority; instead if a claim fails under any necessary [prong] of the ineffectiveness test, the court may proceed to that [prong] first." Commonwealth v. Tharp, 101 A.3d 736, 747 (Pa. 2014) (citations omitted). In particular, when it is clear that the petitioner has failed to meet the prejudice prong, the court may dispose of the claim on that basis alone, without a determination of whether the first two prongs have been met. Commonwealth v. Travaglia, 661 A.2d 352, 357 (Pa. 1995).

At trial, VanDivner was represented by one attorney at the guilt phase, and a different attorney for the death penalty phase. At the PCRA evidentiary hearings, both counsel testified that, although they generally cooperated in discussing and investigating various aspects of VanDivner's case, each

attorney performed separate duties at trial.[6] VanDivner did not testify at any of the evidentiary hearings.

### I.    Failure to Investigate and Present Testimony of Multiple Eyewitnesses

In his first issue, VanDivner claims that "[t]rial counsel were ineffective for failing to investigate and present evidence regarding the circumstances of the crime that indicated [he] was not guilty of first-degree murder." VanDivner's Brief at 18.   Specifically, VanDivner cites Jessica Cable's trial testimony that Jessica saw him grab her mother's hair while he shot her at point-blank range and then afterwards said, "There you, bitch, I said I was going to kill you."   Id.   According to VanDivner, "[a]t the PCRA hearing multiple eyewitnesses testified this was not an execution-style shooting, and furthermore, Jessica was not present when her mother was shot."   Id.

In arguing that the trial court's pre-trial investigation was inadequate, VanDivner essentially argues that trial counsel was ineffective for failing to investigate, interview, and call or subpoena for trial, five neighbor-eyewitnesses who saw the "actual version" of the incident—sisters Cheree and Jessica Parrill, their mother Kim Ropejko, as well as Chrissy Newman—who all lived across the street, and Victor Chamberlain, who lived next door to the

_____

[6] VanDivner refers to both counsel in his ineffectiveness claims and the PCRA court refers to both counsel's PCRA hearing testimony when addressing some of VanDivner's issues.

victim's home.  This Court has noted that such a claim actually raises two distinct issues:

> Neglecting to call a witness differs from failing to investigate [and/or interview] a witness in a subtle but important way.  The failure to investigate presents an issue of arguable merit where the record demonstrates that counsel did not perform an investigation.  It can be unreasonable per se to conduct no investigation into known witnesses.  Importantly, a petitioner still must demonstrate prejudice.  Id.  To demonstrate prejudice where the allegation is the failure to interview a witness, the petitioner must show that there is a reasonable probability that the testimony the witness would have provided would have led to a different outcome at trial.

> In this respect, a failure to investigate and interview a witness claim overlaps with declining to call a witness since the petitioner must prove:  (i) the witnesses existed;  (ii) the witness was available to testify;  (iii) counsel knew of, or should have known of, the existence of the witness;  (iv) the witness was willing to testify;  and (v) the absence of the testimony was so prejudicial as to have denied the defendant a fair trial.

Commonwealth v. Pander, 100 A.3d 626, 638-39 (Pa. Super. 2014) (en banc) (citations omitted).

As to the first part of VanDivner's initial ineffectiveness claim, the adequacy of pre-trial investigation and trial preparation, our Supreme Court has explained that the reasonableness of the investigation depends upon the information supplied to counsel, and that a hindsight analysis is inappropriate:

> Counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary.  See Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).  Where counsel has made a strategic decision after a thorough investigation of law and facts, it is

virtually unchallengeable; strategic choices are made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of investigation. See id. at 690, 691, 104 S.Ct. at 2066. As noted, an evaluation of counsel's performance is highly deferential, and the reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight. Id. at 689, 104 S.Ct. at 2065. Furthermore, reasonableness in this context depends, in critical part, upon the information supplied by the defendant. See Commonwealth v. Peterkin, 511 Pa. 299, 319, 513 A.2d 373, 383 (1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). Thus, assuming a reasonable investigation, where there is no notice to counsel of particular mitigating evidence, he cannot be held ineffective for failing to pursue it. See Commonwealth v. Howard, 553 Pa. 266, 276, 719 A.2d 233, 238 (1998).

Commonwealth v. Basemore, 744 A.2d 717, 735 (Pa. 2000) (emphasis added).

As to the adequacy of trial counsel's pre-trial investigation, the PCRA court, after hearing testimony from both counsel at the evidentiary hearing, concluded that the pre-trial preparation and strategy in VanDivner's case was reasonable. It explained counsel's efforts in detail:

Attorney Susan Ritz Harper was appointed as counsel for [VanDivner] for proceedings post-arrest through his state court appeals, and Attorney Dianne Zerega was appointed to represent [VanDivner] during the penalty phase. At the hearing on [VanDivner's PCRA petition], Attorney Zerega testified credibly that Attorney Harper and the investigator through the public defender's [office] "went to the location and interviewed people in the community" and that [Attorney Zerega] "focused more on getting evaluators, talking to the family, trying to find records, that would help."

Attorney Harper testified convincingly that: At the time our investigator in the Public Defender's Office was Mr. Judy,

- 12 -

and Mr. Judy and I went down into Grindstone, and knocked on all the doors of all the houses around [. . .] where the incident happened. We spoke to the people. If we didn't, if there [was] no one home, no one who answered, we left Public Defender cards in the door with the telephone number to please contact us. I believe Mr. Judy also did investigation with phone records. If someone contacted us, we would follow up on that.

When questioned as to who Attorney Harper spoke to in the community, she responded from her notes, and named multiple people [whom] she and the investigator, Mr. Judy, interviewed. Attorney Harper stated that Jessica Parrill was contacted and that "she had nothing to say and wouldn't speak to us." Further, they attempted to contact Cheree Parrill, but "the numbers [they] were given—she didn't live there" and Jessica Parrill would not provide any contact information for Cheree Parrill. Still further, Attorney Harper testified credibly that, "[f]rom all the cards I left on people's doors, no one was calling back."

Other neighbors claimed to have memory loss or that they "knew [VanDivner] and "would not help us in any way, and hoped he never got out of jail." Attorney Harper identified a community member, Ms. Mitchell, who witnessed [VanDivner] in a fight with William Cable, shooting him, chasing him, and then firing more shots. Based on that statement, Attorney Harper made a trial strategy decision to not call Ms. Mitchell as a witness since such testimony would admit [VanDivner] was shooting a gun and pursuing the minor victim. Attorney Harper was unable to find any eyewitnesses to refute the Commonwealth's evidence that [VanDivner] shot the victim [. . .] at a close range, or any witness who told her that Jessica Cable was not present during the homicide of her mother.

\* \* \*

Further, the reasonableness of counsel's investigative decisions depends critically on the information supplied by the defendant. We also find no evidence that [VanDivner] provided any name of witnesses to assist in his defense.

\* \* \*

- 13 -

> From the testimony, we conclude that Attorney Harper's investigation was reasonable, including her utilization of an investigator, her visiting the crime scene to attempt to locate eyewitnesses to provide testimony to assist in her defense of [VanDivner], and her leaving business cards to contacted if any member of the community wanted to testify in aid of the defense of [VanDivner].

PCRA Court Opinion, 1/17/14, at 7-10 (citations omitted).

Our review of the record supports the PCRA court's conclusion that the extent of trial counsel's investigation was reasonable, given that the people interviewed were either unwilling to testify or their proposed testimony would have been detrimental to VanDivner's defense. While in hindsight, PCRA counsel posits other measures trial counsel could have taken to locate the eyewitnesses at issue, this hindsight analysis cannot form the basis of an ineffectiveness claim. Basemore, supra.

As to the second part of VanDivner's initial claim of ineffectiveness, the failure to call these eyewitnesses at trial, the PCRA court concluded that VanDivner did not meet his burden of establishing all of the factors identified above in Pander, supra:

> Based on the testimony of Attorney Harper, which we found to be credible, we cannot find that Jessica Parrill, Cheree Parrill, Kimberly Ropejko, Chrissy Newman, and Victor Chamberlain, were available or were willing to testify for the defendant at the time of trial.
>
> * * *
>
> [VanDivner] has failed to show how the absence of the proposed testimony by these witnesses was so prejudicial to him to have denied him a fair trial. Specifically, there is no evidence to dispute that [VanDivner] intentionally shot

the victim at close range, whatever the actual distance may have been.

PCRA Court Opinion, 1/17/14, at 9-10. We agree. Because VanDivner did not testify at any of the PCRA hearings, as correctly noted by the PCRA court, there is no evidence of record that he provided trial counsel with the names of any potential witnesses.

VanDivner further claims that these witnesses gave "compelling, synchronized evidence" which would have led to a conviction of only third-degree murder. VanDivner's Reply Brief at 10. This claim is belied by not only our review of the record, but also by our Supreme Court's rejection of VanDivner's challenge to his first-degree murder conviction in his direct appeal. The Court summarized:

> The trial evidence overwhelmingly established that [VanDivner] killed [the victim] and it was amply sufficient to prove that he acted with a specific intent to kill. Four separate eyewitnesses to the murder testified that [VanDivner] shot [the victim] in the head with a handgun. Upon apprehension, [VanDivner] freely admitted to police that he had killed [the victim]. Dr. [Cyril] Wecht testified that [the victim's] manner of death was homicide, caused by the gunshot wound to her head. Specific intent [was] also supported by the very fact that [VanDivner] went to [the victim's] home with a loaded handgun, his contemporaneous statement that he told [the victim] that he would kill her, and the fact that he promptly followed through on this threat. Finally, the jury could infer specific intent from [VanDivner's] use of a handgun upon [the victim's] head.

VanDivner I, 962 A.2d at 1176 (emphasis added).

VanDivner's claims to the contrary are without merit. Initially, we note that VanDivner's challenge to Jessica's trial testimony ignores the testimony of Patrick Rimel, who consistent with Jessica, testified that as he drove by he saw VanDivner with a handgun, saw VanDivner grab the victim's hair, and shoot her in the head. See N.T., 2/7/07, at 114-19. Even if VanDivner shot the victim in the head from a distance of ten to twelve feet, rather than, as consistent with the expert medical testimony, in close contact to her, this in no way vitiates the inference of a specific intent to kill. As noted by the PCRA court, regardless of the distance from which VanDivner fired at the victim, the inference of specific intent remains because VanDivner shot her in a vital part of her body. PCRA Court Opinion, 1/17/14, at 10. Indeed, our Supreme Court found the fact that VanDivner brought a loaded gun to the house established his intent to kill. VanDivner I, supra. Thus, VanDivner cannot establish prejudice from trial counsel's failure to call these witnesses and his first ineffectiveness claim fails.

## II. Failure to Introduce Already-Available Evidence of Diminished Capacity

In VanDivner III, our Supreme Court found that testimony VanDivner presented to establish his intellectual disability, both at the pre-trial Atkins hearing and during the PCRA evidentiary hearings, rendered him ineligible for the death penalty. Id. 178 A.3d at 122. In his second issue, VanDivner claims that trial counsel were ineffective for failing to use the same evidence

presented at the pre-trial Atkins hearing to establish a diminished capacity defense to first-degree murder. See Commonwealth v. Taylor, 876 A.2d 916, 926 (Pa. 2005) (explaining that a successful diminished capacity defense can reduce a murder conviction from first to third degree). In short, VanDivner claims that these same experts should have be used in order to establish his inability to form the specific intent to kill.

At his Atkins hearing, VanDivner presented the testimony of two experts, Adam Sedlock, and Lawson Bernstein, M.D., to support his claim that he was intellectually disabled. At his subsequent murder trial, VanDivner's trial counsel called only Sedlock, a local psychologist, who testified regarding tests he performed on VanDivner, that indicated a low IQ of 66 and other mental limitations. According to Sedlock, these tests showed that VanDivner "has impairment, that there are organic traits, that he has problems with impulsivity and that his cognitive problems he is experiencing indicate a poor prognosis." N.T., 2/8/07, at 291.

VanDivner argues that trial counsel erred in failing to call Dr. Bernstein and in failing to further question Sedlock about his ability to form the specific intent to kill. He claims that since both Sedlock and Dr. Bernstein previously testified that he was intellectually disabled, their testimony would show he lacked the ability to form the specific intent to kill. VanDivner's Brief at 36-37. Using testimony from Kristine M. Jaquin, Ph.D., given at a PCRA hearing, VanDivner claims that "both Bernstein and Sedlock's opinions could have

[easily] been developed to support the diminished capacity defense[.]" VanDivner's Brief at 38.

After our careful review of the record, we find no merit to VanDivner's claim because he inappropriately applies a hindsight analysis to support his claim of trial counsel's ineffectiveness. See Commonwealth v. Fisher, 813 A.2d 761, 767 (Pa. 2002) (explaining "[s]peculation by hindsight that a different strategy might possibly have been successful is not the test which establishes ineffectiveness of counsel"). The fact that VanDivner now believes that he should have relied on different portions of the experts' previous testimony does not establish that trial counsel's performance was ineffective.

Moreover, in VanDivner I, the Court outlined the parameters of the diminished capacity defense:

> Diminished capacity, however, is an extremely limited defense. Psychiatric testimony that addresses mental disorders affecting the cognitive functions of deliberation and premeditation necessary to formulate a specific intent is admissible. However, psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill.

VanDivner I, 962 A.2d at 1183 (emphasis added; citations omitted). Although VanDivner focuses on certain expert testimony from the pre-trial Atkins hearing that tended to show he was intellectually disabled, he cites no authority that a finding of an intellectual disability equates, in all instances, to a "mental disorder" that would prevent him from forming the specific intent to kill. See VanDivner's Brief at 33-41.

Finally, VanDivner cannot establish prejudice. Although VanDivner argues Sedlock was never asked directly if VanDivner's mental limitations would have prevented him from forming the specific intent to kill, Sedlock did testify as to VanDivner's low IQ, the fact that he exhibited damages to that part of his brain which controls thinking before acting, as well as a history of VanDivner's head trauma. See N.T., 2/8/07, 283-291. In her closing, trial counsel cited this testimony to argue that VanDivner could not develop a specific intent to kill. Although our Supreme Court found that Sedlock's testimony was in fact inadmissible, VanDivner I, 962 A.2d at 1183, the Commonwealth did not object on this basis, and the trial court instructed the jury regarding the diminished capacity defense.

As previously noted by our Supreme Court, VanDivner's "jury was not obligated to believe his claim . . . of diminished capacity, and apparently it did not do so." VanDivner I, 962 A.2d at 1177. This is understandable, especially because VanDivner's "own statement to police shortly after the murder that he killed [the victim] and recognized that this case was a death penalty case corroborates his full awareness of what he had done." Id. VanDivner does not consider the effect of his own statement on his prejudice analysis. Because counsel had a reasonable basis for her trial strategy and VanDivner cannot establish prejudice, VanDivner has failed to meet his burden of proving his second claim of ineffectiveness.

III.   Failure to develop evidence to support a voluntary

manslaughter instruction

In his third issue, VanDivner acknowledges that trial counsel requested a jury instruction on the crime of voluntary manslaughter (heat of passion) and that the trial court refused.  VanDivner argues that trial counsel "were ineffective for failing to uncover and present additional, readily-available evidence to support the voluntary manslaughter instruction they had requested."  VanDivner's Brief at 42-43.  This claim centers around evidence that, on the morning of the killing, the victim and Larry Newman made ten to fifteen harassing phone calls to VanDivner.

Our Supreme Court has recently discussed the elements of this type of voluntary manslaughter as follows:

> In order to successfully argue heat of passion, a defendant must prove (1) provocation on the part of the victim, (2) that a reasonable man who was confronted with the provoking events would become "impassioned to the extent that his mind was incapable of cool reflection," and (3) that the defendant did not have sufficient cooling off time between the provocation and the killing.  See Commonwealth v. Busanet, 618 Pa. 1, 34-35, 54 A.3d 35, 55 (2012) (holding no evidence of provocation where the victim's threats against [Busanet] were made weeks prior to the shooting, thereby affording [him] sufficient time to engage in cool reflection) . . .  Further, "[i]f any element is missing, the provocation defense fails." [Commonwealth v. Martin, 607 Pa. 165 5 A.3d 177 (2010)].

Commonwealth v. Mason, 130 A.3d 601, 628 (Pa. 2015).

Here, the PCRA Court first discussed the evidence proffered by VanDivner that would support a voluntary manslaughter instruction:

> "Serious provocation" means conduct sufficient to excite an intense passion in a reasonable person. 18 Pa.C.S. § 2301.
>
> To support this contention, [VanDivner] presented the testimony of the victim's neighbor, Kimberley Ropejko, who testified . . . that around 7:30 or 8:00 on the morning of the shooting, Larry Newman made ten to fifteen phone calls to [VanDivner] discussing [Newman's] relationship with the victim[.] [Id. at 161]. Ropejko could hear the telephone calls, and stated that Larry Newman did not threaten [VanDivner]. Id. [VanDivner] also presented the testimony of Cheree Parrill, the daughter of [Ropejko], and also a neighbor of the victim. Cheree Parrill testified regarding the relationship of the victim and [VanDivner] stating that, "They always partied. They argued. He drove up and down the road a lot." N.T., 1/30/2013 at 7.

PCRA Court Opinion, 1/17/14, at 11-12.

The PCRA court then discussed the testimony from both VanDivner's trial counsel with regard to the information they received regarding these calls. After discussing relevant case law, the PCRA court then explained why VanDivner's ineffective assistance claim lacked merit:

> Here, [VanDivner] fails to show a correlation between Larry Newman . . . calling [VanDivner] numerous times on the morning of the shooting and how those actions could incite "serious provocation" in [VanDivner] such that it led to him shooting the victim some twelve hours later. Most importantly, the provocation, if any, came from Larry Newman. There is no evidence that the victim provoked [VanDivner]. Further, the most recent evidence of alleged provocation occurred twelve hours before the shooting, a time of sufficient "cooling" period for a reasonable person to regain his capacity to reflect. Finding that sufficient evidence of provocation did not exist, and that [VanDivner]

had sufficient time to "cool off" if he had felt provoked, we cannot find trial counsel ineffective for failing to uncover and develop this evidence. We also note that [trial counsel] was aware of this evidence and, by reason of trial strategy and tactics, a determination was made to not attempt to introduce such evidence.

PCRA Court Opinion, 1/17/14, at 14. Our review of the record, along with the case law cited above, supports the PCRA court's conclusions.

VanDivner's claims to the contrary are unavailing. He first asserts that there was evidence of additional phone calls to which the PCRA court did not refer, including one made by the victim in which she told VanDivner that another male was going to perform anal sex on him. VanDivner's Brief at 50. As acknowledged by VanDivner, however, Attorney Zerega knew about the content of this call, but still maintained that the call was not helpful to VanDivner's defense. See N.T. 1/30/13, at 110-11.

VanDivner further alleges that trial counsel's investigation of this evidence fell below the reasonableness standard. We disagree. See Mason, 130 A.3d 601, 630 (rejecting as meritless Mason's claim regarding a heat of passion defense based upon the "stormy relationship" he had with the victim; even considering the other evidence proffered by Mason but not used at trial, "it was not unreasonable for counsel to forgo attempting to persuade the jury that [Mason] acted in the heat of passion"). In short, VanDivner did not demonstrate that the "alternatives not chosen offered a potential for success substantially greater than the tactics utilized." Commonwealth v. Clark, supra.

Finally, again, VanDivner cannot establish prejudice in this claim. According to VanDivner, "[h]ad the jury been presented with the taunting and teasing both Larry Newman and [the victim] inflicted on [him] the jury would have determined that [he] was guilty of voluntary manslaughter." VanDivner's Brief at 48. VanDivner further argues that a voluntary manslaughter verdict would have resulted since trial counsel presented "expert testimony regarding [his] inability to control his impulses." Id.

In support of his argument, VanDivner claims that the PCRA court overlooked the fact that voluntary manslaughter is often found in cases involving failed romantic relationships and triangles. Here, VanDivner claims that the PCRA court "ignored the sequence of events which culminated in the homicide," and those cases "where the romantic relationship deteriorated over a period of time while the antagonism escalated." VanDivner's Brief at 50.

We disagree. The evidence proffered by witnesses at the PCRA evidentiary hearings revealed little information regarding the history of the romantic relationship between VanDivner and the victim. Moreover, had such a relationship been established, the fact remains that a twelve-hour period elapsed between the alleged phone calls and the victim's murder. See Mason, 130 A.3d at 629 (explaining that, "the passage of time between provocation and the 'passion' must be viewed as a cooling period, and killings will not be deemed to have occurred under the heat of passion where there was sufficient time for cooling between whatever provocation might have existed and the actual killings").

VanDivner has failed to demonstrate that trial counsel was ineffective for failing to produce at trial additional evidence to support a voluntary manslaughter (heat of passion) jury instruction. Thus, VanDivner's third claim of ineffectiveness fails.

## IV.    Amendment of PCRA; Brady violations

In his fourth issue, VanDivner argues that the PCRA court erred by not permitting him to amend his pleadings to include additional alleged Brady[7] violations that were only discovered when Trooper Monkelis' testified during one of the PCRA evidentiary hearings.

Regarding alleged Brady violations, our Supreme Court has summarized:

> In Brady, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The duty to disclose may encompass impeachment evidence as well as directly exculpatory evidence, and the prosecution's duty under Brady extends to exculpatory evidence in the files of police agencies of the same government prosecuting the case. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. However, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense.

Commonwealth v. Smith, 985 A.2d 886, 900 (Pa. 2009) (citations omitted).

---

[7] Brady v. Maryland, 373 U.S. 83 (1963).

In order to establish violations of Brady, VanDivner argues:

> The Commonwealth admittedly did not turn over a witness statement [(Randy Lee Price)] that would have impeached Larry Newman's testimony to show [Newman] was drunk and combative on the night of the homicide. During the PCRA hearing, the lead investigator revealed additional evidence to support Larry Newman's impaired state. [Trooper Monkelis] testified that Larry was "highly, highly, highly intoxicated" to the point where he could not be interviewed about the night's events. The trooper also revealed that the state police had interviewed neighbor-eyewitnesses but did not memorialize those interviews in reports or disclose that evidence to the defense. The PCRA court erred by not permitting VanDivner to amend his pleadings to incorporate this new evidence. These Brady violations prejudiced VanDivner's trial.

VanDivner's Brief at 18-19.

The PCRA court determined that, even if a Brady violation occurred regarding the one undisclosed statement, trial counsel credibly testified at the PCRA hearing that this information would not have changed their strategy, and they would not have used the undisclosed statement:

> [Attorney Harper] was provided the witness statement of Randy Lee Price at the hearing on the instant PCRA Petition. After reviewing the statement, Attorney Harper testified that she would not have used Mr. Price as a witness at trial, or his statement during trial, nor would the statement have caused her to change her trial strategy. Under cross-examination, questioning as to whether the statement of Randy Lee Price could have corroborated the fact that Larry Newman was drinking, Attorney Harper agreed that it could have established that Larry Newman was drinking. Nonetheless, Attorney Harper testified, credibly, that she still would not have used the statement "[b]ecause if [she] brought Randy Price to testify, then [she] would assume he would be opened for [cross-examination on] his whole statement and [she] did not want the rest of that statement

- 25 -

to come in. Attorney Harper explained her decision, "strategically I would not bring in someone to show that they are going to say someone is drinking if the rest of it is going to be, he is saying [VanDivner] called, threatened to kill them all. No I wouldn't strategically bring it in for that limited purpose. I don't believe [the statement] would be limited."

Attorney Zerega, who served as counsel for the penalty phase, was also provided the witness statement of Randy Lee Price at the hearing on the PCRA Petition. Having read the statement, Attorney Zerega testified that the statement of Randy Lee Price would not have changed her strategy or the testimony.

PCRA Court Opinion, 1/17/14, at 18-20 (citations omitted).

Based upon the credible testimony of Attorneys Harper and Zerega that the statement of Randy Lee Price would not have changed their trial strategy, and that the statement would not have been used at either the trial or penalty phase, the PCRA court concluded that VanDivner was not prejudiced by the Commonwealth's failure to provide Randy Lee Price's statement. Id. at 20.

Our review of the record supports the PCRA court's conclusions. VanDivner claims the PCRA court erred by not allowing him to amend his petition to add the Brady claims. VanDivner also complains that the PCRA court did not rule on his written request to amend. However, VanDivner was not prejudiced by the PCRA court's inaction because the request would have been denied. As noted above, the PCRA court specifically credited the testimony from trial counsel. As the record supports the PCRA court's credibility determination, the determinations are binding on this Court. Commonwealth v. Spotz, 18 A.3d 244, 259 (Pa. 2011).

The PCRA court did not address VanDivner's additional alleged Brady claims regarding Trooper Monkelis' testimony about Newman's condition on the night of the murder and the state police interviews other neighbor-witnesses. Nevertheless, as these interviews were not memorialized, we find no Brady violation.

For the above reasons, VanDivner's fourth claim fails. The PCRA court did not err in refusing to allow VanDivner to amend his PCRA petition to add Brady claims, and any Brady violation did not deprive VanDivner of a fair trial.

## V. Illegality of Sentence

The Commonwealth concedes VanDivner's fifth issue, and acknowledges that VanDivner's illegal sentence claim is meritorious. The trial court sentenced VanDivner to 20 to 40 years of imprisonment for that attempted homicide of Billy Cable and an additional 10 to 20 years of imprisonment for the aggravated assault of Billy Cable. This was error; VanDivner's convictions for aggravated assault and attempted murder regarding Billy Cable should have merged for sentencing purposes. See generally, Commonwealth v. Anderson, 650 A.2d 20 (Pa. 1994). Thus, we vacate the consecutive term of 10 to 20 years of incarceration imposed for VanDivner's aggravated assault conviction of Billy Cable. The 20-40-year sentence for attempted murder remains. As this does not upset the trial court's sentencing scheme, there is no need for a remand. See Commonwealth v. Melvin, 103 A.3d 1, 56 Pa. Super. 2014) (explaining Superior Court "has the authority to correct an illegal

sentence directly rather than to remand the case for re-sentencing as long as we do not disrupt the trial court's sentencing scheme in doing so").

## VI.    Cumulative Prejudice

In his sixth and final issue, VanDivner asserts that he is entitled to post-conviction relief due to "the cumulative prejudicial effect" of the errors he raises in this appeal.  It is now well-settled that where "multiple instances of deficient [trial counsel] performance are found, the assessment of prejudice properly may be premised upon cumulation."  Mason, 130 A.3d at 674 (citation omitted).  Except for VanDivner's sentencing claim, we have determined that all of his other claims do not merit relief.  Thus, VanDivner's final issue fails.

In sum, all of VanDivner's claims on appeal, except for his fifth issue regarding his sentence, are meritless.  We therefore affirm those portions of the PCRA court's order denying him post-conviction relief.  However, we vacate his 10 to 20-year sentence for the aggravated assault of Billy Cable.

Order affirmed in part and judgment of sentence vacated in part. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/2018